**Jack T. WEEDIN, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 21418.**

United States Court of Appeals
Ninth Circuit.

June 14, 1967.

Rehearing Denied July 27, 1967.

---

Richard D. Harris, Seattle, Wash., for appellant.

Eugene G. Cushing, U. S. Atty., Michael Hoff, Asst. U. S. Atty., Seattle, Wash., for appellee.

Before BROWNING, DUNIWAY, and ELY, Circuit Judges.

BROWNING, Circuit Judge:

Jack T. Weedin challenges the sufficiency of the evidence to sustain his conviction of aiding and abetting (18 U.S.C. § 2) Daniel Raymond Schwartzenberger and Lawrence Arthur Smith * in the robbery of a bank (18 U.S.C. §§ 2113(a) and 2113(b).

The government's evidence clearly established that Schwartzenberger robbed the National Bank of Commerce in Seattle, Washington, on February 10,

* Smith's appeal is pending in this court.

1966, and Weedin does not contend otherwise. He argues that the evidence was insufficient to show that he aided and abetted the others in the commission of the crime. Stated briefly, and with conflicts and contradictions resolved in favor of the government, the evidence against Weedin was as follows.

Weedin was a deputy sheriff for King County. He met Schwartzenberger a few months before the robbery when the latter was being held in the King County jail on charges of robbery and possession of narcotics. Schwartzenberger was released on bail during January 1966.

The two men were in contact personally or by telephone a half dozen times after Schwartzenberger's release on bail.

Late in January, Weedin searched out Schwartzenberger and arranged to and did meet with him in a Seattle tavern.

Early in February, Weedin approached two of Schwartzenberger's friends in a bar in Schwartzenberger's hotel and said he wanted to see Schwartzenberger. One of the two men told Weedin that Schwartzenberger was "out looking for a caper."

On February 3, Schwartzenberger phoned Weedin three times at his home.

On February 8, Weedin went to Schwartzenberger's hotel room and asked his roommate, Neil Estes Scott, "if we had a chance to look at the Kirkland job yet, and I said no, we hadn't. I said I didn't want anything to do with it, at least until I had looked at it—we didn't have a gun and we didn't have a car, and he said he'd take care of that. And I said, 'Well, I don't know what Danny plans to do first, I don't know whether he's going to do something in Kirkland or rob a bank.'" Weedin said "he wanted to get in touch with Danny [Schwartzenberger] as soon as he could or have him call."

During the night of February 9, Schwartzenberger called Scott at their room to get Weedin's telephone number, which was hidden on a picture frame. Schwartzenberger then called Weedin, reaching him after Weedin had gone to bed. According to Weedin, he agreed to sell Schwartzenberger a .45-caliber automatic for three hundred dollars, to be delivered to Schwartzenberger that night and to be paid for the following afternoon at three o'clock. Weedin drove to downtown Seattle from his suburban home and delivered the weapon and seven rounds of ammunition to Schwartzenberger at 11:00 p. m. Weedin and Schwartzenberger were together for approximately fifteen minutes in Weedin's car; Weedin testified that Schwartzenberger attempted to get him to accept five hundred dollars rather than three hundred dollars for the gun, but he refused.

Schwartzenberger robbed the bank the following day at approximately 2:15 p. m., using a .45-caliber automatic. At 3:00 p. m. Weedin went to the agreed-upon place to receive his payment but Schwartzenberger did not appear.

When first questioned by the FBI agents, Weedin stated he had seen Schwartzenberger only twice after Schwartzenberger's release on bail; he denied having seen Schwartzenberger February 9; and he denied having sold or delivered a pistol to Schwartzenberger on that night. Weedin admitted the latter transaction only after the FBI agents confronted him with their knowledge of its occurrence. His explanation of the two earlier meetings with Schwartzenberger were that the first was to tell Schwartzenberger that another prisoner, Bob Crites, wanted Schwartzenberger to pick up some clothing belonging to Crites; and that the second was to deliver twenty-five dollars which he had agreed to lend to Schwartzenberger. He originally stated the first meeting occurred in Schwartzenberger's hotel room, but later changed the place of the meeting to coincide with government proof as to a meeting between the two men at another location. He originally stated that the second meeting occurred February 8,

but changed this date to February 3 after the government introduced evidence of the three telephone calls from Schwartzenberger's hotel to Weedin's home on that date. The change in date also served to weaken the adverse inference which would otherwise be drawn from the fact that Weedin told the FBI agents that when he loaned Schwartzenberger twenty-five dollars he believed him to be unemployed and without funds, yet the next day agreed to sell Schwartzenberger a gun for three hundred dollars, payable within twenty-four hours. Weedin fixed the February 3 date by reference to a check for twenty-five dollars given to Weedin by his son, which Weedin testified represented a loan to enable Weedin in turn to lend the money to Schwartzenberger.

■■ We think this evidence justified submission of the question of Weedin's guilt to the jury. Weedin's conversation with Scott, the circumstances under which the gun was sold to Schwartzenberger, and Weedin's contradictions, false denials, and incredible explanations were sufficient to permit the jury to conclude beyond a reasonable doubt that Weedin knew Schwartzenberger planned a robbery, and that he sought by his action to make it succeed. It was unnecessary for the government to prove that Weedin was aware of the details of the planned offense. Benchwick v. United States, 297 F.2d 330, 332–33 (9th Cir. 1961), and cases cited.

■ Weedin argues that the portion of Scott's testimony to the effect that he told Weedin that Schwartzenberger was "going to do something in Kirkland or rob a bank" was inadmissible hearsay. Weedin's premise is that this testimony was a repetition by Scott of an extrajudicial statement made to Scott by Schwartzenberger. But that is not necessarily so. And even if Weedin's premise were accepted, Scott's testimony would not be subject to attack as hearsay for it was not offered to prove that Schwartzenberger in fact planned to rob a bank, but rather to prove that Weedin had reason to think that he had. McCormick, Evidence § 228, at 464–65 (1954).

■■ We doubt that it was error to admit Phelps' testimony as to Schwartzenberger's end of a telephone conversation with Weedin; but if it were the error would be harmless in view of Weedin's written statement and trial testimony admitting the substance of the conversation. Nor was it error for the court to permit Phelps to testify when it appeared that he had been in the courtroom in violation of the court's order excluding witnesses, since none of the testimony to which Phelps listened bore upon the subject matter of Phelps' subsequent testimony implicating Weedin. Cf. Scates v. Isthmian Lines, Inc., 319 F.2d 798, 800 (9th Cir. 1963).

■ Weedin's remaining specifications of error are also without merit. (1) The record does not warrant a conclusion that the trial court abused its discretion in denying Weedin's motion for severance and his request for additional peremptory challenges. (2) The three occurrences upon which Weedin bases his argument that a retrial should have been ordered appeared to us to have been trivial incidents in a lengthy and complicated trial which could not have affected the result. Weedin did not assert a mistrial on these or any other grounds. (3) We agree with Weedin that evidence of good character may be sufficient alone to create a reasonable doubt of guilt (Michelson v. United States, 335 U.S. 469, 476, 69 S.Ct. 213, 93 L.Ed. 168 (1948); Johnson v. United States, 269 F.2d 72, 74 (10th Cir. 1959)), but we cannot agree that the court's instructions, read as a whole, failed to inform the jury of this principle adequately and fairly. Weedin's criticism of the instruction given seems to us strained and hypercritical.

Affirmed.