**Ralph Martin KLOPP, Petitioner,**

v.

**SECURITIES AND EXCHANGE COMMISSION, Respondent.**

**No. 19411.**

United States Court of Appeals, Sixth Circuit.

June 5, 1970.

456

Morris Berick, Cleveland, Ohio, for petitioner; Burke, Hager & Berick, Morris Berick, Cleveland, Ohio, on brief.

Walter P. North, S. E. C., Washington, D. C., for respondent; Philip A. Loomis, Jr., Gen. Counsel, Walter P. North, Associate Gen. Counsel, Jacob H. Stillman, Asst. Gen. Counsel, Alan Blank, Atty., S. E. C., Washington, D. C., on brief.

Before COMBS, Circuit Judge, O'SULLIVAN, Senior Circuit Judge, and WILSON, District Judge.

O'SULLIVAN, Senior Circuit Judge.

We consider the petition of Ralph Martin Klopp for review of an order of the Securities and Exchange Commission whereby he, a registered Cleveland representative of the brokerage firm of Paine, Webber, Jackson & Curtis, was found guilty of willful violation of Section 17(a) of the Securities Act and Sections 10(b) and 15(c) (1) of the Exchange Act and Rules 10b–5 and 15c1–2,

> "by making false and misleading statements of material facts concerning one of his customer's accounts."

The punishment imposed upon petitioner Klopp was that he be,

> "barred from being associated with any broker or dealer provided that after one year he may become associated with a broker or dealer in a non-supervisory capacity upon a showing that he will be adequately supervised."

The hearing examiner who heard the case had ordered that Klopp be "suspended from association with a broker-dealer for a period of four months from the effective date of this order." The Commission, however, felt that notwithstanding Klopp's "previous good record and his public service in civilian life and with the armed forces," the "public interest" required that a "more substantial sanction be imposed."

We read the Commission's order as permanently forbidding the petitioner from progressing in his chosen profession no matter what his conduct and accomplishment in the remaining years of his life.

We reverse.

The case borders on fantasy. In substance, the alleged wrongdoing of Klopp was that he took advantage of two busy bachelors, each in his thirties, who were very much "on the make" in the stock market. It is claimed that, motivated only by a desire to increase his commission earnings, Klopp persuaded Kerzman and Kaucnik to increase their trading by telling them that he had a doctor client who was a big and successful trader, whose activities might well provide a pattern for Kerzman and Kaucnik to follow.

The promise of success in this plan was enhanced by Klopp allegedly telling the bachelors that the big "doctor" had available to him a "Chinese Chartist." Neither of Klopp's accusers testified as to his understanding of the abilities or powers of a "Chinese Chartist." Perhaps they wished to leave the impression that Klopp led them to believe that the source of the doctor's uncanny predictive ability was a Chinese Chartist, possessed of a clairvoyant "system" for charting the future course of the stock market or some other equally accurate mystic capacity. At the trial, Kerzman and Kaucnik were not asked by the Commission's attorneys, nor did they volunteer, their own understanding of the connotations of the word. They never asked Klopp to tell them about it. Neither our own perusal of the record nor the expertise of the Commission provided us with any understanding of the phrase's meaning.

The accusers testified in effect that while Klopp did not identify his doctor client by name, Klopp promised to let them know when the doctor made a significant sale or purchase of stocks held in his portfolio. Kerzman and Kaucnik claim that they employed this false information, believing it to be true, in their own trading—all to their detriment and loss. They testified that this program began in about July of 1962, and continued until September of 1963. At that time they went to the SEC, not, they said, to accuse Klopp, but to find out whether there really was a big

doctor who enjoyed the success that seemed to elude them. The Commission's order, which instituted this proceeding, was entered on January 20, 1966. The hearing examiner's Initial Decision came down November 28, 1967, and the Order of the Commission on review was announced January 22, 1969.

It was assumed throughout the hearing that one of Klopp's clients, a Dr. Rigel, may have been the big operator that Kerzman and Kaucnik were importuned to follow. Petitioner Klopp denied the charges made by his accusers, although he said there were times when he would discuss some customers' accounts with others. He stated that he did not make a practice of such discussions. He said:

"I might have said something like, in a general way, I had a doctor that bought, you know, something or other. I am talking in a general nature now."

When asked whether he had occasion to discuss the holdings of any of his customer's accounts with any other customer in 1962, he answered, "I might have in an offhand manner," and further, "I might have said 'Paine-Webber has made a recommendation on General Motors and I have had a lot of my customers buy General Motors.' I could have said this to another customer." To the question by the hearing examiner, "And how about the doctor that you said in an offhand way you might have made some reference to other customers?" the petitioner answered, "I might have used that description. I had a doctor that bought a lot of, you know, Beckman Instruments or something of that sort. It's possible I could have said that, yes, sir. * * * it is not my best recollection that I did, but I wouldn't want to deny it."

Petitioner Klopp testified that his accusers were around his desk at Paine-Webber frequently, even daily at times; that they heard him talking on the telephone to his customers, including a Dr. Rigel, and other of his clients, some of whom were doctors. Throughout the hearing there was an extensive compari-son of the buying and selling in Dr. Rigel's account with the activities of Kerzman and Kaucnik.

We are aware of the limitations of our review power and that the weight to be given the evidence and the testing of the credibility of the witnesses is in general, and initially, the prerogative of the involved administrative agency. We think, however, that a good beginning will be a review of the characters and lives of the adversaries—Klopp on the one hand and Kaucnik and Kerzman on the other. We think such review will be helpful in testing whether the Commission has met its burden of proving the charge it makes against the petitioner.

Ralph Martin Klopp was 42 years old at the time of the hearing in 1966. As a young man, he had graduated from Cleveland South High School; he was president of his senior class. He was president of the National Honor Society and a member of the school student council. During his high school days he was employed by the Cleveland Press in various capacities, first as newsboy and later in the circulation department of the paper. He then obtained a scholarship and attended the Case School of Applied Sciences—later Case Institute. He entered Case in 1942 and after completion of his first year he enlisted as a private in the Corps of Engineers of the United States Army. He was assigned to a combat engineers battalion whose primary function was to "construct engineering structures, mostly bridges, in a combat zone under fire," thus to facilitate the movement of troops. He went overseas in September, 1944, having become a so-called "buck" sergeant in his "outfit." He was in England and France, serving on the continent in the combat area until the end of the war. Overseas he was promoted first to Technical Sergeant and then to Master Sergeant, the highest non-commissioned rank. Thereafter, he was given a battlefield commission as a Second Lieutenant. He earned two battle stars for the Rhineland and Central European campaigns. He received a Good Conduct

Medal and was awarded the Croix de Guerre. He returned to the United States in the spring of 1946 and was then released from active service into the Inactive Reserve. He reentered Case Institute and graduated in January, 1949, with a Bachelor of Science degree in Mechanical Engineering. In college he was a member of Alpha Chi Sigma, an honorary society. He was on the staff of a school publication called "The Differential" and was its business manager for one year. He was vice-president of his fraternity, Phi Kappa Tau.

Upon graduation in 1949, Klopp went to work for Johns-Mansville Corporation, and receiving promotion, returned to Cleveland, Ohio, from Charleston, West Virginia, to become District Sales Manager in the Cleveland Office. He worked for Johns-Mansville until his resignation in 1958. During those years Klopp was a member of a service club and was active in the affairs of his church. On the hearing of this matter, he gave the following as his reason for resigning from Johns-Mansville:

> "In my job as district sales manager, I was intimately connected with the sale of materials to people like contractors, municipal and city governments and in that area—sometimes it was necessary to do things and there were some policies that I just seriously disagreed with.

> "Well, you would have to—there were gratuities involved with contractors; there were payoffs; there were, at conventions there were—well there were call girls and things like that."

That the foregoing was the reason for Klopp leaving Johns-Mansville was confirmed by John S. Watterson of Paine-Webber who said all of their references on Klopp were good, and

> "In the case of Mr. Klopp, I can recall that Mr. Cowden told me that he talked to the manager at Johns-Mansville and that he told him that—he had said to Mr. Klopp that he was too honest to be in the business that he

was in, selling supplies to municipalities where he had to grease the palm of somebody to get an order; that it was repulsive to him and therefore he couldn't do as good a job; and that he had urged Mr. Klopp to get into another business, although he had been successful in selling for them. This is what he told us."

It is sufficient to say that Klopp decided to get into the brokerage business. He was given standard training at Cleveland and New York to equip himself to act as a registered representative of Paine-Webber. After some years with Paine-Webber, he was selected to conduct classes or seminars for persons interested in stock investment. The trial examiner noted that in the training course Klopp "displayed outstanding ability" and that he received excellent scores on the examination he took to become a registered representative. Klopp left Paine-Webber voluntarily in August of 1964 because of an opportunity to join the management of the Cleveland office of Hayden Stone, Incorporated, another brokerage firm. He was still with that company when the instant hearings began in 1966, and presumably is still with them. Since he finished college and his army service, Klopp, over twenty-five years, has known but three employers, serving all of them to their satisfaction. When he left Paine-Webber, Klopp had some 400 clients of whom only the accusers here, Kerzman and Kaucnik, ever complained of his representation. In addition to this history, several character witnesses who knew Klopp and his life testified, in effect, that it would be unbelievable that Klopp could be guilty of the shady and disreputable "shenanigans" as charged by the SEC upon the word of Kerzman and Kaucnik. Klopp was married and the father of six children, one of whom was a retarded child. Except for the charges made in this proceeding and Klopp's connection with the Mark Christian account, which we will discuss later herein, no misconduct by Klopp was demonstrated.

One of the accusers, Kaucnik, was a partner in an insurance agency. The other, Kerzman, was a salesman for the Hickok Electrical Instrument Company. Beyond this, all we know of them is that they were bachelors in their thirties, "swingers" in their stock market activities and in their social lives. Neither of them made any protest at being so described.

■■ While an exemplary life up to the moment of wrongdoing will not excuse criminal or fraudulent conduct, such a life will stand a man in good stead when he is accused of shabby or criminal conduct which he denies, and when he is cast in a contest against accusers whose own lives present nothing special to support assertions of integrity. Character witnesses affirmed Klopp's good life and reputation until he fell afoul of the SEC. Such good life and reputation are not of controlling importance but provide weight in assessing Klopp's credibility and the likelihood that he actually committed the acts of which he stands charged by the SEC. So true is this that the United States Supreme Court has said that under some circumstances a man's reputation may be sufficient, by itself, to raise a reasonable doubt of his guilt. In Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948) the Court said:

"This privilege [use of character witnesses] is sometimes valuable to a defendant for this Court has held that such testimony alone, in some circumstances, may be enough to raise a reasonable doubt of guilt and that in the federal courts a jury in a proper case should be so instructed. Edgington v. United States, 164 U.S. 361 [17 S.Ct. 72, 41 L.Ed. 467]." 335 U.S. at 476, 69 S.Ct. at 219.

See also Johnson v. United States, 269 F.2d 72, 74 (10th Cir. 1959); Weedin v. United States, 380 F.2d 657, 660 (9th Cir. 1967).

■ As already observed, we are conscious of the confines of our power in such a case as this, as set out in Con-

solo v. Federal Maritime Comm'n., 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966), and other cases. Generally, where it is correct to do so, the Courts yield to the *expertise* of the members of administrative agencies. However, where the plain issue is whether Klopp or his accusers told the truth, we recognize no special expertise in the Commission. We, of course, must give weight to the examiner's opportunity to observe the demeanor of colliding witnesses. But neither the Commission nor its examiner give any consideration to demeanor in their opinions. The Commission has the right also to draw inferences which we must accept, *if legitimate*. Under Section 25(a) of the Act of 1934, 15 U.S.C. § 78y, it is provided that "the finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." The judiciary has become well acquainted with the duties and prerogatives of a reviewing court in determining whether an administrative agency's findings are supported by substantial evidence. These functions are set out in Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). There the Court said:

"The Wagner Act provided: 'The findings of the Board as to the facts, if supported by evidence, shall be conclusive.' Act of July 5, 1935, § 10(e), 49 Stat. 449, 454 [ch. 372], 29 U.S.C. § 160(e). This Court read 'evidence' to mean 'substantial evidence,' Washington, V. & M. Coach Co. v. National Labor Relations Board, 301 U.S. 142, 57 S.Ct. 648, 81 L.Ed. 965, and we said that '[s]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." 340 U.S. at 477, 71 S.Ct. at 459.

\* \* \* \* \* \*

"Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that deci-

sion is substantial, when viewed in the light that the record in its entirety furnishes, *including the body of evidence opposed to the Board's view."* 340 U.S. at 488, 71 S.Ct. at 465. (Emphasis supplied.)

Obeying that rule, we cannot conscientiously find that the Commission's decision is supported by substantial evidence when the entire record is reviewed.

This opinion would be unduly long if we undertook a complete review of the voluminous record in this case to point out each part of the testimony that contributes to our conclusion. We will, however, set out this analysis:

1. *The stories of Kaucnik and Kerzman.*

In 1961 these young men became acquainted with Klopp while attending a seminar conducted by him as a representative of Paine-Webber. Impressed with his knowledge and abilities, they often employed him to carry on their stock market transactions. Their trading through him and through a substantial number of other brokerage firms continued uneventfully until May of 1962, at which time there was a sharp drop—a "crash"—in the market. On a day in such month, Kerzman was sitting at Klopp's side watching the board at Paine-Webber when, looking at the board, Klopp is alleged to have said something to the effect that "they had pegged it almost perfectly." Klopp is said then to have explained that the "they" who had pegged it right had sold a particular stock while the market was high and bought in again after the market went down. Kaucnik and Kerzman testified that Klopp explained that the "they" who had properly "pegged" the market consisted of a doctor customer of Klopp who was aided by a New York investment advisor and a Chinese Chartist.

Wishing to recoup losses suffered in the crash, both Kaucnik and Kerzman claim they began to follow the trading of "the doctor" as such trading was made known to them by Klopp, from July, 1962, until September, 1963. The only motivation they could assign for Klopp's strange advice was that he wanted to keep their accounts active to increase his commission earnings. The evidence showed, however, that Klopp's commission earnings from the Kaucnik and Kerzman accounts were no greater than commissions earned by Klopp from some twelve or fifteen other accounts. For the years 1962 and 1963, his total commissions from Kaucnik and Kerzman amounted to $1,930 and $2,080, respectively.

Both of these young men said that soon after beginning to "follow the doctor" they became suspicious of Klopp's use of "the doctor" to guide their investments. They mentioned several circumstances that activated such suspicions. For example, their own check of market transactions on several occasions seemed to indicate that the "doctor's" transactions did not appear as great as, they claim, they had been told by Klopp. On one of these occasions, the two testified, Klopp told them that the doctor had bought 1,000 shares. On the same day they both "followed the doctor" by purchasing 100 shares of the same stock. But, they testified, they found in the Wall Street Journal that only 800 shares had actually been traded on that day. They called this to Klopp's attention and he "brushed it off" as a mistake. The evidence, however, showed that their claim of what they said appeared in the Wall Street Journal, at least, was erroneous.

Their suspicions of Klopp apparently began in about August, 1962 and continued to September, 1963, when they went to the SEC. Yet they did not talk to anyone in Paine-Webber. Neither did they discuss their suspicions with the several other brokerage firms through which they were also actively trading— Merrill Lynch, Pierce, Fenner & Smith; Goodbody & Co.; Gunn, Carey & Ralston; and others. Even though suspicious of Klopp, they did nothing until Kaucnik approached the Cleveland office of the Commission in September,

1963. At one point in his testimony, Kaucnik stated that he went to the SEC to make a complaint against Klopp. But later he changed this story, testifying that he went there only to find out whether "I was following a doctor with an enormous account or I wasn't." But he recanted his testimony again, returning to his first story:

"Q. When you came you say you wanted to make a complaint against Ralph Klopp.

"A. Yes, sir."

The proofs showed that while there were some occasions when one or both made purchases of the same stock as some "doctor," real or fictitious, generally there was no pattern that could be followed. One or both of the accusers said that there were times when they confined their transactions to "the doctor's" purchases and sales. But the proofs showed that both Kaucnik and Kerzman were dealing on their own through Paine-Webber and other brokerage houses. Even the respective purchases of Kaucnik and Kerzman did not follow an identical pattern.

### 2. The complaint to the SEC.

About September 13, 1963, Kaucnik and Kerzman made a tape recording of an alleged telephone conversation with Klopp. There was much confusion and contradiction as to how and why this tape was made. Kaucnik seemed unsure as to whether it was made in anticipation of going to the SEC or not. There was evidence that he made it at the suggestion of a retained attorney. The record before us is of little help on the significance of this recording as an aid to the SEC's case. Klopp heard the tape and denied that any such conversation ever took place, although he said that parts of it sounded like his voice and some did not. Kaucnik denied the suggestion that some splicing had taken place. The SEC put on an expert witness to say that the tape was Klopp's voice. Experts for Klopp attacked the ability of the SEC's expert to identify

the voice of Klopp. The examiner accepted the tape as evidence. On review, the Commission decided not to consider it; so it is not of any importance here.

The evidence showed that upon review of the period from January 1, 1962, through September 30, 1963, Kaucnik's account with Paine-Webber disclosed a net loss of $6,385 and Kerzman's account showed a net loss of $7,969. In his statement to the SEC, Kaucnik said he prepared a list of his losses from Klopp's inducing him to follow the doctor. He then said, "It adds up to $22,325 and is a sum of realized losses and unrealized profits that would have resulted had I not liquidated my securities in the execution of the plan." In Kerzman's statement to the SEC, he said that about November 1, 1962, "my holdings reflected significant losses totalling approximately $20,000." Later in his statement he said, "By following the doctor I lost $15,000 on security transactions * * *." While Kaucnik said at one time that he only went to the SEC to find out if there really was a doctor with a Chinese Chartist for an advisor, there was evidence that he had then been consulting an attorney. We doubt that any attorney would expect the SEC to be able to verify the existence of such an unnamed doctor with a Chinese Chartist for an advisor. Klopp was pressed by the SEC's counsel as to what he thought might have prompted Kaucnik and Kerzman to go to the SEC. Klopp's speculation was that they might have had some idea of suing him for their losses. Kaucnik and Kerzman's attorney did not appear at the hearing. During the examination of one of the accusers concerning his attorney's participation in the complaint to the SEC, the latter's counsel suggested that the examiner advise the witness of his privilege not to disclose his discussions with his attorney. Thereafter, on several occasions the witness resorted to "I will consult my attorney" instead of answering. There was evidence that, at various times, Kaucnik and Kerzman lost more on their accounts with other brokers

than in their accounts with Paine-Webber. Petitioner Klopp testified that he had tried, without success, to dissuade these young men from their aggressive dealings; he described them as "frantic traders" after the so-called May, 1962, crash.

Both of the young men admitted that if the fantasy they described actually occurred, they were themselves active participants in an unethical and shady deal. They freely admitted that they were quite willing to be a part of such shabby dealing.

### 3. *The "Mark Christian" account.*

Both the examiner and the Commission considered that a so-called "Mark Christian" account greatly, if not totally, destroyed petitioner's credibility. Prior to the opening of this account, Klopp's wife maintained a trading account at Paine-Webber. The wife's money was used for whatever trading was done through it. There was nothing irregular about this account and Paine-Webber was fully aware of it. The manager of Paine-Webber, however, did on one occasion tell Klopp that he thought there was too much activity in the account. No wrongdoing of any kind, however, was involved in the establishment and maintenance of this account.

The "Mark Christian" account did involve deception in that the name "Mark Christian" was fictitious. The names "Mark" and "Christian" were the first and middle names of one of Klopp's sons. A bank account was also maintained in such name. The monies that went into and out of the account were also those of Klopp's wife. Mrs. Klopp signed the account and the name "Mark Christian" on checks drawn on the account. Klopp testified that the account was established in anticipation of the formation of a partnership to engage in the investment business, such partnership to carry the name "Mark Christian." Under advice of his attorney, Klopp soon found that the plans he had in mind were not feasible and the ac-

count was immediately discontinued on Klopp's own initiative. There was evidence that several doctors had planned to become partners in such enterprise. There was also evidence that a modified form of such organization was actually established in the brokerage firm with which Klopp was later connected at the time of the hearing. There is no question that Klopp gave false information to Paine-Webber by the use of the "Mark Christian" account. An inference could, admittedly, be drawn that this account was maintained, at least in part, as a means of allowing Klopp's wife to do more trading than would be approved by Paine-Webber. However, neither Paine-Webber nor anyone else was harmed by this shortlived account; it was closed out by the Klopps on their own volition. The use of fictitious names to facilitate the carrying on of various business enterprises may be all too common in today's business world. To hold as we do does not require that we fully condone the maintenance of the "Mark Christian" account. In our view, however, it was not sufficient to destroy the credibility of petitioner.

### 4. *The total weight of the evidence.*

During the first taking of evidence in 1966, both Kaucnik and Kerzman offered to submit to a lie detector—polygraph—test. Klopp did likewise. During a recess period in the hearing, Klopp submitted to such a test, administered by an expert whose qualifications were conceded. The test was conducted to test the truth of Klopp's testimony at the hearing. The expert who gave the test was produced and the results of his test of Klopp were offered in evidence. The SEC's objections to the results of the test were properly sustained, but the fact that Klopp had taken the test was received in evidence as bearing on his credibility. Both Kaucnik and Kerzman, in repudiation of their original agreement, refused to submit to such tests. It is fair to infer that their change of mind was the product of advice from the SEC's attorneys. They both said they

would take such a test if the SEC would direct it. The SEC attorneys, to the obvious comfort of Kaucnik and Kerzman, remained silent during their opportunity to approve or direct the tests. Klopp then agreed to submit to any further test that would be arranged. It was not done.

We are aware that such lie detector tests have not attained such acceptability as to permit their results to be admitted in evidence; neither is the fact that a party or a witness was willing or unwilling to submit to such a test ordinarily admissible. However, the willingness of Klopp to submit to such a test or tests, and the refusal of his accusers to do so was, in this case, received and considered on the question of credibility.

### 5. *Conclusion.*

■ To thoroughly and at length set out our impressions, gleaned from examination of the entire record, would require extensive and needless writing. We will conclude, then, with these additional observations, justified by our study of the record.

1. Kaucnik, one of petitioner's accusers, resorted to the device "I don't remember" over 150 times when pressed for answers of important relevance.

2. Kerzman, the other accuser, also frequently employed such device.

3. Each of the accusers at various times said that in their stock market activities—after they learned of "the doctor" who had the aid of a "Chinese Chartist"—their buying and selling followed the pattern set by the doctor. They said there were periods when all of their trading conformed to the doctor's activities. This was not true, and they indulged in numerous contradictions in this regard. There was evidence that at relevant times they were doing more trading with their several other brokerage agencies than through Paine-Webber. They had maintained margin accounts with all or some of these other brokerage firms. Among such were Murch & Co.; Ball, Burgess & Kraus; Goodbody & Co.; Gunn, Carey & Ralston; Merrill Lynch, Pierce, Fenner & Smith and possibly others.

4. Both Kaucnik and Kerzman testified that they early entertained suspicions of Klopp's doings, and his alleged story of the "Chinese Chartist." Available to them for a period of about a year, during which they said they followed Klopp, were all of their other brokerage agents as well as the management of Paine-Webber. Yet not once during this time did they seek to allay or confirm their suspicions until the fall of 1963, when they went to the SEC. It is inconceivable to us that the curiosity of these young sophisticates would let a year go by without some inquiry and testing of the existence and the talents of a "Chinese Chartist."

5. Petitioner Klopp, however, rarely professed a lack of recollection of important events. From reading his testimony, we get the impression of an honest man whose successful career is quite understandable.

We are unable to join the hearing examiner in his statement that,

"Unquestionably, the probative effect of the testimony is weakened by the failure of Kaucnik and Kerzman to be specific and consistent throughout their stays on the witness stand and by the contradiction of some elements of their testimony which is present in other evidence referred to by respondents, but in sum their testimony on salient aspects of the issues involved remains credible and must be accepted."

Nor in his statement, relative to their tape recording, that:

"Neither Kaucnik nor Kerzman testified categorically that no splicing occurred during or after the recording of the conversation with Klopp, *their testimony being guarded in that respect as well as in numerous others,*

as might be expected of witnesses testifying to events three years in the past." (Emphasis supplied.)

We cannot join the Commission's related observation that:

"The inconsistencies and contradictions in the customers' testimony, which Klopp stresses, do not in our view impair the credibility of such testimony in its most significant aspects. To some extent they are trivial in nature and some appear to be attributable to memory lapses respecting transactions which took place in 1962 and 1963 when the customers engaged in considerable trading. It is not necessarily inconsistent with their testimony as to Klopp's representations that they had a substantial number of transactions which did not follow what Klopp represented to be the doctor's trading, *although it does indicate that their reliance on such trading was possibly less complete than some of their testimony would suggest.* And the fact that, as Klopp stresses, they had previously engaged in short-term trading through other brokers as well as through him is outweighed by the significant change to which we have referred that took place after the asserted misrepresentations." (Emphasis supplied.)

The SEC's brief to this Court suggests speculative rescuing of the credibility of Kaucnik and Kerzman in this manner:

"Although Kaucnik's and Kerzman's trading patterns were not identical, the differences *may have been* attributable to a number of factors. For example, as the Commission noted, Kaucnik testified that his trading declined in 1963 because of losses previously sustained by him. Not only did the two customers thus have different amounts of money available at different times, but *they may not have been* able to devote the same amount of time to following the market—Kaucnik is a partner in an insurance agency and *may have had* a relatively more flexible schedule than

Kerzman, an employee of a manufacturing company." (Emphasis supplied.)

The Commission's opinion and order are not supported by substantial evidence. We reverse its Decision and Order insofar as it relates to petitioner Klopp. The matter is remanded to the Securities and Exchange Commission for the vacation of its Order of January 22, 1969, as it relates to petitioner, and for dismissal of the proceedings as they relate to him.