Sidney BUCHMAN and Joseph Buchman, Petitioners-Appellants,

v.

SECURITIES AND EXCHANGE COMMISSION, Respondent-Appellee.

No. 422, Docket 76–4184.

United States Court of Appeals, Second Circuit.

Argued Jan. 27, 1977.

Decided April 20, 1977.

817

Sidney Buchman and Joseph Buchman, petitioners-appellants pro se.

James H. Schropp, Special Counsel, Securities and Exchange Commission, Washington, D. C. (David Ferber, Solicitor to the Commission, Washington, D. C., of counsel), for respondent-appellee.

Before ANDERSON, OAKES and GUR-FEIN, Circuit Judges.

GURFEIN, Circuit Judge:

Joseph Buchman and Sidney Buchman appear *pro se*. They petition, pursuant to Section 25(a)(1) of the Securities Exchange Act of 1934, 15 U.S.C. § 78y(a)(1), to review an order of the Securities and Exchange Commission (the Commission) entered on May 28, 1976. In that order the Commission sustained the determination of the National Association of Securities Dealers, Inc. (NASD) that the Buchmans, as principals of Shaskan & Co., Inc., an NASD member, had violated the NASD Rules of Fair Practice by failing to complete a contract with another NASD member, Torpie & Salzman, Inc. ("Torpie"), which used the facilities of John Muir & Co. The Commission affirmed the sanction imposed on Sidney, a $500 fine, but reduced the $2,000 fine levied by the NASD against Joseph to $1,000. The Commission's review of the NASD actions was pursuant to Section 15A(g) of the 1934 Act, 15 U.S.C. § 78o–3(g).[1]

Torpie filed a complaint with the NASD against Shaskan and the petitioners, among others,[2] charging a violation of Article III, Section 1 of the NASD Rules of Fair Practice, which provides that "a member, in the conduct of business, shall observe high standards of commercial honor and just and equitable principles of trade." CCH NASD Manual, ¶ 2151. The complaint was the culmination of a controversy between Torpie and Shaskan arising from the refusal of Shaskan, allegedly without justification, to complete a trade by accepting delivery and paying for 500 shares of Crystalography stock. Shaskan filed an answer defending on the ground that it had refused delivery of the stock in reliance upon advice of counsel and on certain releases of the Commission.

Shaskan entered into the purchase agreements involved on October 5, 1972. Six days thereafter, on October 11, 1972, the Commission suspended trading in Crystalography stock pursuant to Section 15(c)(5) of the 1934 Act, 15 U.S.C. § 78o(c)(5). *See* Securities Exchange Act Release No. 9815 (October 11, 1972). The settlement date for Shaskan's purchase of the Crystalography stock was October 13, 1972, two days *after* the entry of the suspension order. Muir did not tender delivery on that date. The Commission continued the trading suspension on a 10-day basis until May 18, 1973, seven months after the initial suspension.[3] During the entire period of the suspension, Shaskan refused to accept delivery in reliance upon Securities Exchange Act Release No. 7920 (July 19, 1966), in which the Commission took the position that a broker may complete, during a suspension, contracts entered into prior to the suspension only if, *inter alia*, "he has no reason to believe" that his customer is connected with the activity which prompted the suspension.[4] Conversely, Muir did not attempt to deliver the stock to Shaskan.

Muir did attempt delivery to Shaskan on May 18, 1973, the day the suspension was

---

1. At the time the Buchmans applied to the Commission for review of the NASD's action, Section 15A(g) provided:

   "If any registered securities association . . . takes any disciplinary action against any member thereof or any person associated with such member . . . such action shall be subject to review by the Commission, on its own motion, or upon application by any person aggrieved thereby filed within thirty days after such action has been taken or within such longer period as the Commission may determine."

   Pursuant to the Securities Acts Amendments of 1975, Pub.L. 94–29 (June 4, 1975), Section 15A(g) has been modified and redesignated as Section 19(d) of the Securities Exchange Act. For purposes of this case, the provisions of Section 19(d) are not substantively different from former Section 15A(g).

2. The Torpie complaint also joined Meyer Buchman, Muir and Contemporary Securities, Inc., which had bought 200 shares of Crystalography stock from Torpie through Muir and resold them to Shaskan.

3. We have since held that the SEC has no statutory authority to increase such suspension beyond the ten days allowed by the statute, *see Sloan v. SEC*, 547 F.2d 152 (2d Cir. 1976), but we do not predicate the decision on that ground.

4. Securities Exchange Act of 1934, Release No. 7920, provides:

   "A number of questions have been presented recently as to whether, during the period

lifted. Shaskan refused to accept delivery based upon Securities Exchange Act Release No. 10156, 1 SEC Docket No. 16 at page 8, which publicly announced the termination of the suspension in trading in Crystalography stock.

That release contained this significant paragraph:

"The Commission also noted that it had been brought to its attention that there are unconsummated trades in [Crystalography] stock. In view of the allegation presented in the Crystalography release, broker-dealers should take the necessary measures to assure themselves that they are not unknowingly effecting a consummation of open contracts which may be in furtherance, of a scheme to manipulate the price of the securities of Crystalography or would otherwise violate the Federal securities laws."

On May 18, 1973 Shaskan issued a written statement declaring:

"We are not accepting trades of Crystalography Corp., at this time, until further clarification by the S.E.C. of its findings and as to what measures we must take to assure ourselves that we are not unknowingly consummating open contracts which may be in furtherance of a scheme to manipulate the price of the securities of Crystalography or would otherwise violate the federal securities laws."

Shaskan did attempt to obtain "further clarification by the S.E.C." It had its counsel telephone to the Commission asking for advice as to what "necessary measures" Shaskan should take. Counsel was told to make his request for advice in the form of a letter. Such a letter was sent to the Commission on the same day. It was not answered by the Commission staff until a month later, on June 19, 1973.

In the meantime Shaskan's capital position had become impaired, and in *early* June the staff of the New York Stock Exchange directed Shaskan to fulfill open contracts with its customers. Among these transactions were purchases *by its customers* of Crystalography stock at about $10 per share. Some time before it received the long awaited June 19 letter from the Commission staff, it bought shares on the open market for delivery to its customers for about $1.00 per share, which was the price to which the stock plummeted after the suspension was lifted.[5] Muir did not attempt to explain to Shaskan why the shares it had tendered were not tainted by the manipulative scheme which prompted the initial suspension and Shaskan never accepted the 200 shares from Muir.

The District Business Committee of the NASD held, after a hearing at which Sidney Buchman, who was not involved in the Muir trade, testified on his own behalf, that Shaskan and Contemporary had no justification for refusing to accept delivery of the

when trading is suspended by order of the Commission pursuant to Section 15(c)(5) or Section 19(a)(4) of the Securities Exchange Act of 1934, a broker or dealer may complete (e. g., by payment or delivery) an agency or principal contract entered into prior to the suspension.

"It is the position of the Division that where the broker or dealer is himself acting in good faith, where he is not connected with the activity announced by the Commission as a basis for suspension pursuant to Section 15(c)(5) or Section 19(a)(4), and where he has no reason to believe that his customer is so connected, no objection need be raised under such sections because the broker-dealer completes his contractual obligations in the particular transaction (e. g., by payment or delivery) while the suspension is still in

effect. The Division believes that in each such case, however, he should inform his customer, prior to consummating the transaction, that trading in the security is suspended and of the reasons announced by the Commission for suspending trading.

"A broker-dealer, in deciding whether to consummate such a transaction, must of course consider not only the provisions of Sections 15(c)(5) and 19(a)(4) but also all other applicable provisions of the Federal securities laws."

5. One of the grounds for the initial suspension of trading by the Commission had been that the price of the stock had dropped from $10.50 on October 6, 1972 (the very day of the purchases here involved) to $2.00 on October 9, 1972, the space of three days.

Crystalography shares, and, hence had acted in a manner inconsistent with just and equitable principles of trade in violation of Article III, Section 1, *supra*. Shaskan and Contemporary, *see* note 2, were suspended for ten days. Joseph Buchman was fined $2,000, as was Meyer Buchman, another principal of Shaskan. Sidney Buchman was fined $500. An appeal was taken and a subcommittee of the NASD Board of Governors held a hearing and affirmed the decision of the District Committee.

On appeal to the Commission, oral argument not having been requested, the Commission reviewed the record certified by the NASD. The Commission set aside the NASD's findings and sanctions as to Meyer Buchman, but sustained the NASD's finding of misconduct by Joseph and Sidney Buchman as well as Shaskan. The $500 fine levied against Sidney was sustained. The Commission reduced the fine levied against Joesph, however, to $1,000, on the ground that there was no violation in the Contemporary transaction, since Contemporary had never tendered the shares, and because Joseph's conduct may have been predicated to some extent on advice of counsel.[6]

■ Joseph and Sidney Buchman, *pro se*, filed a petition for review in this court, pursuant to Section 25(a) of the Act, 15 U.S.C. § 78y(a). In our review we must consider the record as a whole, *R. H. Johnson & Co. v. Securities Exchange Commission*, 198 F.2d 690, 695 (2d Cir.), *cert. denied*, 344 U.S. 855, 73 S.Ct. 94, 97 L.Ed. 664 (1952), which includes the body of evidence opposed to the Commission's view. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1954). The respondent Commission recognizes that "the entire record may—and should—be viewed to determine whether there is substantial evidence to support the Commission's action," and concedes that the scope of judicial review set out in *Universal Camera, supra*, applies to review of Commission orders under § 25(a), even though § 25(a) does not contain the words "on the record considered as a whole." *See also Kivitz v. SEC*, 154 U.S.App.D.C. 372, 475 F.2d 956, 961 (1973); *Klopp v. SEC*, 427 F.2d 455, 460–61 (6th Cir. 1970). A Court of Appeals does not have to accept inferences drawn by the Commission unless it finds them to be legitimate inferences. *Klopp v. SEC, supra*. In this case, the Commission took no additional evidence and its inferences are based on the factual findings of the NASD. The Commission staff had no opportunity to judge and report issues of credibility.

■ With deference to the Commission, we believe that under the circumstances of this case, Shaskan's refusal to complete the Muir transactions during and after the suspensions, was colorably justified by the confusion as to the true state of the market and as to the applicable law. By this we do not mean that Shaskan necessarily has a defense to a claim by Muir for breach of contract.[7] But, as the Commission concedes, it is well-settled that "a breach of contract between NASD members is of no concern to the NASD or to the Commission if such breach does not contravene the ethical standards embodied in Article III, Section 1." The Commission itself has held that a refusal to complete a contract based on a reasonable belief that a transaction was part of a manipulative scheme does not violate Article III, Section 1. *Southern Brokerage Co.*, 42 S.E.C. 449 (1966). There are, of course, situations in which this claim is a sham, and if it is found that "petitioner did not have a belief both honest and reasonable that there was a manipulative scheme afoot at the time of the contractual default," its failure to fulfill contractual obligations would violate Article III, Section 1. *Nassau Securities Serv.*

---

6. We have characterized the imposition of a $1,000 fine as the "maximum fine in the NASD arsenal of remedies." *See Nassau Securities Service v. SEC*, 348 F.2d 133, 136 (2d Cir. 1965).

7. We assume without deciding that Shaskan's failure to accept delivery constituted a breach, notwithstanding that it may have been able to make out the defenses either of illegality or impossibility.

*v. SEC,* 348 F.2d 133, 135 (2d Cir. 1965).[8] The touchstone, in other words, is good faith—the ultimate test of violation of an ethical standard. A breach of contract is unethical conduct in violation of NASD Rules only if it is in bad faith, just as conduct violates rule 10b–5 only if there is *scienter*: intent to deceive, manipulate or defraud. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The measure of culpability then becomes whether appellants were in good faith.

Appellants here, unlike the appellant in *Nassau Securities Service, supra,* were put on notice by the Commission itself that there had actually been unlawful manipulation of the price of Crystalography stock. And, as we have seen, the Commission itself notified the broker-dealers in the public release lifting the seven-month old suspension of trading, Release No. 10156, that there was a real possibility of a spill-over of the unlawful activity with respect to open contracts. The release warned brokers "to assure themselves that they are not unknowingly effecting a consummation of open contracts which may be in furtherance of a scheme to manipulate the price of securities of Crystalography." Unlike the situation in *Nassau Securities Service, supra,* upon which the Commission relies, there can be no doubt of appellants' *bona fide* belief "that there was a manipulative scheme afoot" and that, based upon the warning issued by the Commission after the suspension was lifted, the manipulative scheme still affected open contracts. This record does not support a conclusion that appellants were snatching excuses out of thin air. They were bound to cooperate with the Commission in refusing to accept stock which would succeed in bringing the fruits of manipulation to a guilty seller.

■ The Commission takes the position, nevertheless, that the burden was on petitioners to show that the *particular transactions* which they refused to complete were tainted with the price manipulation. We do not agree. It seems to us rather that, when a seven-month suspension is lifted with warnings from the SEC, the broker attempting to deliver stock sold in the flurry of trading activity which precipitated the suspension in the first place, has the burden, if questioned, to tender some evidence that the stock was not tainted. After all, the Commission, after seven months of investigation, did not disclose the nature of the manipulation and who the culprits were. To put the burden of affirmative investigation on a purchasing broker-dealer imposes a task beyond his capacity, at least without substantial leads from the Commission or the United States Attorney. In short, it is hard to see how Shaskan could have determined that the particular shares tendered were or were not part of the manipulative scheme when it was not informed about the nature of the scheme or the identity of its participants. And yet it had been told to be on guard.

The cases upon which the Commission relies, in attempting to shift the burden to petitioners, are inapposite. In *Charters & Co. of Miami, Inc.,* 43 S.E.C. 175 (1966), petitioner alleged that its failure to honor certain contractual obligations was due to insufficient funds and, therefore, was not in bad faith. The Commission properly noted, however, that the record failed to reveal when the dishonored transactions occurred, the nature of those transactions, or the relationship between the insufficiency of funds and the failure to complete the transactions. It was in this sense that the Commission held that it rested with the petitioner to establish a justification for its conduct: the petitioner must develop sufficient facts to indicate that its claim is not a sham. We think that the Buchmans have overcome that hurdle by virtue of the tim-

8. There we intimated that it would have been proper for the Commission, *if* objection had been made, to remand for further findings where an NASD committeeman erroneously believed, contrary to *Southern Brokerage Co.,* *supra,* "that it was irrelevant whether the subject matter of the contract which petitioner breached was part of a manipulative scheme." 348 F.2d at 136.

ing of the transactions, the Commission's trading suspension, and its own warning.

Similarly, in *Mutual Funds Serv. of Fla., Inc.,* 42 S.E.C. 1035 (1966), the petitioner alleged that it refused to complete certain transactions after being told "by a staff attorney [of the Commission's Miami branch office] whose name he could not recall that the affairs of the issuer were under investigation" and that many shares of the company in question were unregistered. There, unlike here, petitioner could not point to any formal public commission action. There, unlike here, petitioner *could* make some efforts to ascertain the truth of the allegation (that the shares were unregistered).

Our conclusion that Shaskan's failure to make inquiries as to the legality of the particular transactions cannot be taken as substantial evidence of bad faith is reinforced by the fact that the record substantiates the efforts of appellants to obtain clarification from the Commission staff as to the proper course of action in the unusual circumstances here involved. Their counsel sought advice over the telephone; if the matter was as simple as the Commission now implies, the advice could readily have been given on the spot. Instead, no doubt due to the difficulty of formulating an answer, the Commission's response was held up for a month. We do not suggest that the Commission was at fault. It is a busy, overworked agency. But that is not the issue. The issue is whether it is fair to require appellants to have acted more quickly than the Commission itself.[9]

We think that the decision below is contrary to the policy of the Commission enunciated in *Southern Brokerage, supra.* In that case the Commission rejected the NASD position "that there is no right to rescind the contract where there is no claim that the other party was a participant in any fraud." The Commission there explained that if the broker honestly and with reasonable basis believed that its transaction with the complainant was part of a fraudulent scheme he was entitled to refuse to carry out the transaction. 42 S.E.C. at 453–54.

■ We also do not find persuasive the Commission's argument that it was unethical for appellants to wait seven months— that is, until the suspension was lifted—to seek guidance. Neither Muir nor the Commission seriously contend that Shaskan improperly refused to accept delivery *pending* the suspension. As for delay in seeking guidance for post-suspension trading, it was fair to assume that a staff member would be able to answer its query on the telephone in sufficient time for it to accept delivery.

■ Nor did the Commission properly find fault with appellants for meeting commitments to their customers by buying stock on the open market instead of consummating the open contracts with Muir. The dilemma which the SEC Release No. 10156 created for Shaskan was heightened when, in *early* June, the Stock Exchange ordered Shaskan to fulfill the open contracts with its customers. Shaskan was still waiting for a reply to its letter of May 18 to the Commission. Its phone call to a staff member of the Commission had resulted in no advice except that Shaskan should make written communication with the Commission. Thus, prior to its receipt of the ambiguous answering letter of the Commission dated June 19, Shaskan was under pressure from the Exchange to satisfy its

9. While the *pro se* brief of appellants is hardly a legal brief, there is a piquant character to some of its points. For example, one of the questions it poses is: "If what Shaskan through counsel requested of them was a simple matter for the layman to know what was required, why did their staff refuse to answer on the phone and then take one month to respond by letter?" It is also pithy: "Shaskan's request was simple—tell us what you require and we will do it," as well as succinct: "Joseph Buchman had two choices: (1) Delivered out what he strongly believed to be 'tainted stock' already held in the house or (2) to buy clean stock on the open market—he elected the latter," and accompanied by a *tour de force*: "No inquiries were ever made to Shaskan, by either Muir or Torpie, to determine if *we* were involved." p. 25.

customer commitments. Shaskan can hardly be held to be at fault for not satisfying these customer contracts by accepting the Muir stock. Especially before it received advice from the Commission, Shaskan could well have feared that shares contracted for at the apex of the manipulation may have been tainted. The shares purchased on the open market, by contrast, were presumptively untainted, for the Commission had supplied its own imprimatur by revoking the suspension of trading, an indication that the manipulative scheme was no longer in effect. Similarly, it was not an act of bad faith for Shaskan to satisfy its customer commitments on the open market, instead of delivering Crystalography shares in its portfolio. For again there was reason to believe, especially in view of the warning in the Commission release, that "in house" shares purchased at the apex of the manipulation were "tainted," whereas shares being traded on the open market could be considered free of taint because the suspension had by then been formally lifted by the Commission.

### Sidney Buchman

Sidney Buchman also challenges the action taken against him on a separate ground. He says that he did not participate at all in making the decision to refuse to accept delivery of the Crystalography stock and that there is no substantial evidence to support a finding that he did. Since disciplinary action by the Commission inevitably has a stigmatizing effect, we consider his contention separately.

The Commission concedes that there is no evidence that Sidney participated in the initial decision not to accept delivery of the Crystalography shares for Muir,[10] but it notes that Sidney had discussions with others at Shaskan *after* the brokerage firm decided not to accept trades in Crystalography stock. The Commission held that Sidney Buchman as a vice-president and director of Shaskan, "had some degree of responsibility for resolving the problems arising from the uncompleted transactions once he was aware of the situation." In its brief, it argues that "the record is devoid of any indication that he urged that the firm honor its contractual commitments or that he asked his fellow principals what factual basis they had for believing that the transactions in question were part of a scheme to manipulate the price of Crystalography" (p. 25).

The Commission acknowledges inferentially, however, that Sidney Buchman was not disciplined merely because of this failure to act. We believe that this is indeed a proper conclusion in the light of the standard we have described.[11] Instead, the Commission relies on affirmative conduct by Sidney Buchman: his participation in the decision to purchase shares of Crystalography in the open market for $1.00 per share while he knew that Shaskan already had a contract to purchase such shares from Muir. The Commission brief emphasizes that although Sidney knew that the *Muir* transaction had not been completed, because of fear that it was part of a manipulation, "he made no inquiries to determine whether the *open market* transactions were part of any such 'manipulative' scheme." As we have already noted, the fact that the SEC had lifted the suspension raised a presumption that any such inquiry was unnecessary, whereas there was reason not to use stock purchased prior to the imposition of the suspension because it might be tainted. The record shows, in any event, that it was not Sidney Buchman's decision to make the

---

**10.** Indeed, the NASD also stated: "Sidney Buchman then was not involved in the formulation of Shaskan's refusal policy."

**11.** The Commission's reliance on such cases as *Sutro Bros. & Co.*, 41 S.E.C. 443, 463, is not appropriate. Those cases held that a principal in a brokerage firm may be held responsible when, through a lapse of the duty of care, he is unaware that employees under his supervision and control have not been operating in conformity with applicable laws and rules. Here, of course, the decision not to accept Crystalography stock was made by *other principals* of Shaskan, over whom Sidney Buchman had no control. The Commission's position would in effect hold liable a broker who was outvoted by his partners.

open market purchases, but that he merely attended to the proper execution of orders.[12] We see no evidence in this record, substantial or otherwise, that Sidney Buchman wilfully violated the ethical standards of a trader.

In deciding to grant this petition for review, we emphasize the unusual circumstances of this case and the Commission's own doubts as expressed in its opinion on review of the NASD decision. A broker, confronted with an atmosphere of manipulation or insider trading, faces a real dilemma. He risks a breach of contract action if he refuses to accept delivery, but he risks other sanctions if he accepts delivery in the face of publicly proclaimed suspicions of Securities Act violations which permeate the scene.

The evidence should be truly substantial to support a finding that, in such circumstances, when there is evident manipulation, the broker has wilfully used the situation in a fraudulent effort to avoid his contractual obligation. This is especially true when the alleged ethical misconduct is based on a single transaction and does not even purport to show a course of unethical business practice. We see nothing in our decision which would encourage truly unethical practices or would lower the standards of compliance. Accordingly, we grant the petition. The Commission order is vacated.

---

12. As the trading department manager, Sidney Buchman never maintained a market in Crystalography stock. Nor was delivery or receiving in the jurisdiction of the trading department, but of the cage (back office) which was not under the orders of the trading department, so far as the record discloses.