**Frank J. CRIMMINS, Plaintiff,**

**v.**

**AMERICAN STOCK EXCHANGE, INC., Defendant.**

**No. 72 Civ. 290.**

United States District Court, S. D. New York.

Dec. 12, 1973.

---

13. As examples, the § 1983 claim might require evidence on the legality of Lovgren's entry or his motive in assaulting Simon.

See also D.C., 346 F.Supp. 1256.

Spear & Hill, New York City, for plaintiff; Donald Stuart Bab, New York City, of counsel.

Lord, Day & Lord, New York City, for defendant; John J. Loflin, New York City, of counsel.

## MEMORANDUM

LASKER, District Judge.

Plaintiff, a former registered representative of Walston & Co., Inc., ("Walston") seeks an order vacating a determination by a disciplinary panel of defendant American Stock Exchange ("Exchange") finding him guilty of several violations of Exchange rules, and suspending him for two years. An earlier motion before us resulted in a temporary restraining order preventing the disciplinary panel from announcing its determination until plaintiff's objections to the Exchange's actions were resolved.

Plaintiff moves for summary judgment, asserting that his hearing, the Exchange's conduct throughout the proceedings against him and the determination rendered by the Exchange panel violated the due process requirements of the Fifth Amendment in that (1) he received inadequate notice of the charges against him; (2) the Exchange improperly refused to issue subpoenas required by plaintiff to present exculpatory evidence; (3) the Exchange disciplinary panel applied an unconstitutionally vague standard and also applied the wrong standard in considering plaintiff's conduct; (4) the panel's determination is contrary to law and the evidence; (5) the Exchange's penalty constitutes a deprivation of property without due process of law and (6) the Exchange's conduct violates § 6 of the Securities Exchange Act of 1934, 15 U.S.C. § 78f, and §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. Defendant countermoves for summary judgment.

### I.

The charges brought against plaintiff arose out of his activities in connection with the common stock of Four Seasons Nursing Home Centers of America, Inc. ("FSN") and his relationships with certain officials of FSN.

The series of events giving rise to the charges began in 1967, when a partnership comprised of officers of Walston, including plaintiff, was organized to furnish initial equity capital ("seed money") to FSN in exchange for a substantial stock interest in the new company. Walston subsequently became FSN's principal underwriter, financial advisor and investment banker, managing the initial public offering of FSN stock at $11 per share in May 1968.

At about the same time plaintiff developed business and social relationships with the three principal officers of FSN, and, just before FSN stock was listed on the Exchange in November, 1968, he arranged for the purchase from these officers of a substantial block of restricted, unregistered FSN common shares at a price considerably below the market price of FSN free shares when the purchase was consummated.

Plaintiff's activities in connection with FSN during the period from mid-1968 through the early part of 1970 also included efforts to interest institutional investors in FSN stock and the execution of a large volume of customer orders in FSN stock.

The price of FSN stock had risen steadily from the time of its initial public offering in May, 1968. By the time it was listed on the Exchange in November, 1968 it was selling at $58. Following a 2-for-1 split in January, 1969, it climbed to an all-time high in October, 1969 of $181.50 ($90.75 after the split).

In the Fall of 1969, the Exchange noted an unusually heavy volume of transactions in FSN emanating from Walston, particularly the branch office managed by plaintiff, and began an investigation. The Exchange interviewed plaintiff in the presence of his counsel on November 25, 1969, and again on January 29, 1970. Plaintiff disclosed the nature of his business and social relationships with Jack Clark, a principal officer of FSN, his efforts to promote investor interest in FSN, and his purchase of a large block of unregistered FSN shares on favorable terms.

The Exchange suspended trading in FSN stock in April, 1970, and in March, 1971, issued a Report of Investigation

("Report") describing possible violations of Exchange rules by Walston and a number of individuals including plaintiff. In November, 1971, the Exchange formally charged plaintiff with four violations of Exchange rules. His hearing, before a disciplinary panel in July, 1973, resulted in a nine month suspension of employment and a two year suspension of supervisory duties.

## II.

Plaintiff alleges that the formal charges against him were vague; that the Report, which the charges incorporated by reference, was confusing and factually inaccurate; and that the Exchange refused to respond to interrogatories which he propounded in order to clarify the charges against him.

The three formal charges against plaintiff, covering seven pages, allege conduct "inconsistent with just and equitable principles of trade" and "detrimental to the interest or welfare of the Exchange."

Charge I alleges that plaintiff took an active part in maintaining the "special relationship" between Walston and FSN involving "the activities of Walston as principal investment banker, financial advisor and underwriter for FSN and its affiliates, the access which Walston and its officers had to inside information concerning the operations, policies and plans of FSN, and the substantial financial investment which the firm [and] its officers . . . had in FSN and its affiliates."

Charge I also refers to plaintiff's "close personal or business relationship with the principal officers of FSN," his service of their brokerage accounts, his assistance in arranging financing for FSN, and states that plaintiff was in a position to obtain inside information concerning FSN. The charge further notes plaintiff's extensive and continuing effort to solicit and promote interest and market activity in the stock of FSN during practically the entire period the stock was traded on

the Exchange, his "concerted activities to develop substantial institutional interest in FSN," and his purchase from FSN officers of a "substantial block of FSN stock . . . under agreements providing for extended periods of payment and at unusually low interest rates." The charge alleges that "As a result of these purchase arrangements, [plaintiff] became and remained heavily indebted to the principal officers of FSN." Charge I concludes that plaintiff's course of conduct "tended to serve and enhance [plaintiff's] personal interest and the special interests of his firm, and was in direct conflict with the duty of fair dealing which he owed to the customers of Walston, to the investing public and to the Exchange."

Charge II plainly asserts that plaintiff made a "misstatement about a material point concerning the extent of his indebtedness" to three officers of FSN; and that he engaged in off-board transactions in FSN stock with these officers, in violation of Exchange rules.

Charge III specifies that plaintiff violated § 220.7(a) of Regulation T, promulgated pursuant to § 7 of the Securities Exchange Act of 1934, in connection with his purchase from FSN officers of unregistered FSN stock, by obtaining credit terms more favorable than those permitted under Regulation T.

We believe these charges were more than sufficiently clear and detailed to permit an effective defense, and that they were framed with adequate specificity to set the framework of relevance necessary to govern the proceeding. Douds v. International Longshoreman's Association, 241 F.2d 278, 283 (2d Cir. 1957).

Plaintiff contends, however, that since the charges incorporated by reference the "pattern of circumstances" detailed in the Report, he was hindered in understanding the allegations against him and in the preparation of his defense. His confusion is claimed to result from certain factual inaccuracies in the Report, as well as certain alleged in-

consistencies between the charges and the Report.

The factual inaccuracies, which are conceded by the Exchange, relate to figures reflecting trading activity in FSN; but this problem is remedied by the fact that plaintiff's figures were accepted by stipulation at the hearing. In any event, the figures were not material to the charges.

■ Nor is there merit to the contention that there are confusing inconsistencies between the Report and the charges. Plaintiff claims that the Report is so vague in its references to him that it is not possible to understand the precise conduct alleged to be wrongful, which acts are attributed to plaintiff, and how much of the information in the Report is to be considered "background" and how much is actually part of any given charge.

We believe these "inconsistencies" were certainly not prejudicial to plaintiff, and indeed he offers no support for his conclusory statement that they were. Plaintiff knew as early as November, 1969, when the Exchange first interviewed him, that his activities were merely part of a general investigation of the relationship between Walston and FSN. The Report summarized the entire investigation, but it did not purport to charge plaintiff. The formal charges performed this function, and by themselves gave plaintiff full notice of the claims against him. Furthermore, a comparison of the Report with the charges makes clear that there are no material inconsistencies. Indeed the Report clearly discusses the conduct of plaintiff which was the basis for each of the charges brought against him. Thus, the fact that the Report was incorporated into the charges in order to supply *more detail* to the charging instrument did not in fact result in *less* notice than the charges alone supplied.

■ The Exchange's failure to respond to interrogatories propounded by plaintiff was proper in these circumstances, since there is no constitutional right to demand answers to interrogatories in hearings such as this. Villani v. New York Stock Exchange, 348 F.Supp. 1185 (S.D.N.Y.1973), (correcting memorandum) (March 15, 1973), tff'd sub nom Sloan v. New York Stock Exchange, 489 F.2d 1 (2 Cir. 1973), N.L.R.B. v. Interboro Contractors, Inc., 432 F.2d 854 (2d Cir. 1970), cert. denied, 402 U.S. 915, 91 S.Ct. 1375, 28 L.Ed.2d 661 (1971).

■ Plaintiff argues further that even assuming the charges were clearly set forth in the first instance, he was asked questions at the hearing relating to certain extraneous matters not specified in the charges and that the resulting prejudice infected the entire hearing. The matters claimed to be extraneous are plaintiff's sale to the Exchange FSN Specialist of plaintiff's allocation of newly issued shares of Four Seasons Equity Corp., an affiliated company of FSN (Transcript 427–30); plaintiff's failure to disclose to Walston and his customers his personal purchases of FSN stock from three FSN officers (Transcript 384–88; 517, 528–9); and his placement of 6,400 shares of letter stock in a certain corporation with two of the FSN officers who had sold him his restricted FSN shares. (Transcript 422–3.)

Plaintiff was not prejudiced by the mention of these matters and, indeed, they are relevant to the charges. Plaintiff was clearly put on notice, by the very wording of the charges, that the alleged improprieties related to his entire course of dealing in FSN stock, and with FSN officers, and the resulting conflict of interest as to his public customers. The matters claimed to be extraneous certainly are relevant to that course of dealing.

### III.

■■ Plaintiff claims he was prejudiced by his being questioned at the hearing why the FSN officers singled him out for the chance to purchase restricted FSN stock on unusually good credit terms. Though we agree with plaintiff that this question required a

knowledge of the sellers' motives, we find unpersuasive plaintiff's contention that the Exchange's refusal to subpoena the sellers denied him access to "exculpatory" evidence. We do not believe that evidence of the sellers' motives, whatever they were, would have exculpated plaintiff since the issue in question appears to us to have been the nature of plaintiff's actions and motives.

In any event, plaintiff offers no support for the proposition that the Exchange was required to issue subpoenas in the circumstances present here. Though the language of N.Y.C.P.L.R. § 2302(a), McKinney's Consol.Laws, seems to empower administrative panels such as the Exchange disciplinary panel to issue subpoenas without a court order, the very same provision extends a like power to all attorneys of record in administrative hearings. Plaintiff offers no reason, and we see none why the Exchange was required to issue subpoenas when plaintiff himself was possessed with the requisite power.

### IV.

Plaintiff next contends that the Exchange rule barring conduct in breach of "just and equitable principles of trade" is unconstitutionally vague because the Exchange has never adopted rules specifying the prohibited acts. The contention is without merit. As an experienced registered representative, plaintiff may be fairly charged with knowledge of the ethical standards of his profession, especially where the conduct proscribed involves so central a principle as the avoidance of clear conflicts of interest. We find that, as applied to plaintiff, the Exchange's standard is not impermissibly vague, and that he lacks standing to attack the Exchange standard on the ground that it might be unconstitutional as applied to others. United States v. Raines, 362 U. S. 17, 21, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960).

Plaintiff's assertion that the Exchange applied to his conduct the more stringent "Allied Member" standard although he was charged under the "employee" ethical standards of Exchange Rule 345 must also fail. He offers no support for his assertion that the former standard is "stricter" than the latter and we find the language of the two standards to be virtually identical.

### V.

Plaintiff claims that the panel's determination was contrary to law insofar as it rested upon his duty to disclose his arrangements with FSN officers for the purchase of FSN stock, and his alleged violation of Regulation T, governing the extension of credit in stock transactions. This contention is without merit. Plaintiff was tried for unethical, rather than illegal, conduct so that the panel was not obligated to find a violation of law in order to hold plaintiff guilty.

Plaintiff further contends that his course of conduct relating to the purchase from FSN officers of 30,000 restricted FSN common shares is not comprehended by Regulation T so that, as a matter of law, he could not have violated § 220.7(a) of the Regulation. He also argues that even assuming the applicability of the Regulation, the evidence was insufficient to support the panel's determination on this issue.

The relevant portion of Regulation T reads:

"A creditor may arrange for the extension or maintenance of credit to or for any customer of such creditor by any person upon the same terms and conditions as those upon which the creditor, under the provisions of this part, may himself extend or maintain such credit to such customer, but only upon such terms and conditions."

The significant details of the transactions in question follow: In November, 1968, plaintiff and FSN's three principal officers verbally agreed that plain-

tiff would purchase from them 10,000 shares of unregistered, restricted FSN common stock. In December, 1968, the parties executed a purchase agreement stipulating a price of $35 per share. The transaction was not executed through a brokerage account. Plaintiff made no payment at that time for the shares he received, since the agreement provided that he would make an initial payment of $175,000 (out of a total price of $350,000 by January 15, 1969, with the balance to be paid six months later. On January 8, 1969, FSN common stock split two-for-one, so that plaintiff held 20,000 post-split shares.

In early March, 1969, the parties agreed to a second private purchase of 10,000 (post-split) restricted FSN shares at $30 per share. On March 15, 1969, plaintiff paid $175,000 on account of the first purchase of FSN shares and $55,000 as a down payment for the second. On April 7, 1969, plaintiff executed a note for $245,000 to the three FSN officers representing the balance due on the second purchase. Nothing appears in the record as to subsequent payments.

Plaintiff asserts first that he was not a "creditor" as that term is defined by the Regulation. § 220.2(a) of Regulation T defines a "creditor" as "any broker or dealer including every member of a national securities exchange." § 220.-2(a) refers to § 3 of the Exchange Act for the definition of a "broker". 15 U. S.C. § 78c(a)(4) defines the term "broker" as "any person engaged in the business of effecting transactions in securities for the account of others. . . . ."

■ Plaintiff argues, however, that the definition does not apply to him because the Act also includes a separate reference to a "person *associated* with a broker or dealer" (§ 78c(a)(18), emphasis added), which includes partners and branch managers and that plaintiff cannot be considered a "broker" within the meaning of Regulation T since he was a branch manager of Walston. We have

found no authority, nor is any cited by plaintiff, for such a restrictive application of the term "broker". There is no question that plaintiff was "engaged in the business of effecting securities transactions for others", or that he was a "broker" as that term is commonly understood and as the facial language of the Act, cited above, defines the term.

■ Plaintiff answers that, assuming arguendo he is a broker, he was not a "creditor" in the FSN transaction. However, § 220.7(a) makes clear that the term "creditor" includes one who *arranges* for the extension of credit by a third party. There was substantial evidence before the panel that plaintiff himself requested the credit terms of his stock purchases from FSN officers. (Hearing Transcript 308–9, 402–6; Post-Hearing Memorandum of Amex, Inc., pp. 37–9, quoting testimony of plaintiff at Exchange interview, January 29, 1970) We find that in the circumstances, plaintiff arranged for the extension of credit within the meaning of § 220.7(a).

■ Nor can there be doubt that plaintiff was a "customer" under Regulation T, which defines the term at § 220.2(c) as:

" . . . any person . . . (i) to or from whom a creditor is extending, arranging, or maintaining any credit, or (ii) who, in accordance with the ordinary usage of the trade, would be considered a customer of the creditor and (2) includes, but is not limited to (i) in case the creditor is a firm, any partner in the firm who would be considered a customer of the firm if he were not a partner, and (ii) any joint venture in which a creditor participates and which would be considered a customer if the creditor were not a participant."

■ Plaintiff next contends that Regulation T does not encompass transactions in unregistered or restricted stock. The wording of § 7(a) of the

Act, 15 U.S.C. § 78g(a) which on its face applies to all securities except "exempted" securities, does not support this contention:

"(a) For the purpose of preventing the excessive use of credit for the purchase or carrying of securities, the Board of Governors of the Federal Reserve· System shall . . . prescribe rules and regulations with respect to the amount of credit that may be initially extended and subsequently maintained *on any security (other than an exempted security)*." (emphasis added)

An "exempted security" is defined in § 3(a)(12) of the Act, 15 U.S.C. § 78c(a)(12) to include federal, state and municipal securities and certain others not relevant here. We find nothing in the statute or regulation to suggest that unregistered or restricted securities are exempt under the section, and plaintiff has not called our attention to any authority which suggests that they are.

■■■ Having concluded that one holding plaintiff's position as branch manager in a member firm can be a "broker", a "creditor", and a "customer" as these terms are used in Regulation T, and that the regulation applies to transactions in restricted securities, the special question presented by the unusual circumstances of this case is whether Regulation T is applicable to a "broker", as that term is commonly used, who arranges for the extension of credit (as "creditor") to himself (as "customer") in a personal transaction effected off the market and not through a brokerage account.

However solipsistic an arrangement this may appear, we believe that it does indeed violate § 7(c) and Regulation T. A contrary holding would mean that plaintiff could execute for himself a transaction which the plain language of § 220.7(a) prevents him from effecting for anyone else. Plaintiff argues, however, that although he is a broker by trade, in the transaction at issue he was acting purely as a layman, and since (as he claims) Regulation T does not apply to laymen, his purchase of FSN stock was legal. Plaintiff's syllogism is appealing in its simplicity but, in view of the entire tenor of the securities laws, we find it totally unpersuasive.

■■■ Nothing in § 7 of the Exchange Act, 15 U.S.C. § 78g, or Regulation T suggests or supports the narrow construction which plaintiff advances. It is axiomatic that the Securities Act is not to be narrowly or technically construed, Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967); SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963); Blau v. Rayette-Faberge, Inc., 389 F.2d 469 (2d Cir. 1968).

Although Regulation T does not explicitly describe the precise circumstances presented here, § 7(c) of the Exchange Act uses exceptionally broad language in proscribing conduct designed to circumvent Federal Reserve regulations regarding the extension of credit in securities transactions:

(c) It shall be unlawful for any . . . broker or dealer, directly or indirectly, to extend or maintain credit or arrange for the extension or maintenance of credit to or for any customer—

(1) on any security (other than an exempted security), in contravention of the rules and regulations which the Board of Governors of the Federal Reserve System shall prescribe . . .

(2) without collateral or on any collateral other than securities, except in accordance with such rules and regulations as [the Federal Reserve Board] shall prescribe . . .

(B) to permit the extension or maintenance of credit in cases where the extension or maintenance of credit is not for the purpose of

purchasing or carrying securities or of evading or circumventing the provisions of paragraph (1) of this subsection.

(d) It shall be unlawful for any person not subject to subsection (c) of this section to extend or maintain credit or to arrange for the extension or maintenance of credit for the purpose of purchasing or carrying any security, in contravention of [Regulation T] . . . for the purchasing or carrying of or trading in securities in circumvention of the other provisions of this section."

The Securities and Exchange Commission has held that the personal stock transactions of broker-dealers are subject to Regulation T and that one individual can occupy the dual role of customer and registered representative in the same transaction. In In re Sutro Bros. & Co., 41 SEC 443, 451 (1963), the Commission found that where a salesman effected a transaction in his own account with his employer, he was for Regulation T purposes a "customer" who had arranged for the extension of credit to himself. Though *Sutro* reserved decision on the question whether a salesman would be liable if he obtained credit from a third party, rather than his employer, an early interpretation of Regulation T, (1938 Fed. Reserve Bulletin 763) held that a partner of a brokerage firm may under certain circumstances function as both creditor and customer. An opinion letter of April 24, 1972 of the Federal Reserve Board, indicates, on facts similar to those presented here, that one in a position of considerable responsibility at a brokerage firm may also be considered to occupy the roles of creditor and customer. (Exhibit G, annexed to affidavit of Thomas W. Hill, Jr., September 7, 1973) We believe that the positions of the regulatory agencies best acquainted with the regulation of credit in securities transactions are entitled to considerable weight and we adhere to their evident policy of holding brokerage professionals to the same stringent standards as laymen.

The holding here is consistent with the sole and unquestionable purposes of Regulation T: to protect the market and the public by curbing speculation in the securities markets and the economically destructive fluctuations which excessive credit precipitates; and to protect the small investor, who, mesmerized by all the "action," might join it with outstretched hand, receiving for his eagerness only a margin call. See Pearlstein v. Scudder & German, 429 F.2d 1136 (2d Cir. 1968); Moscarelli v. Stamm, 288 F.Supp. 453 (E.D.N.Y.1968); Collateral Lenders v. Board of Governors of Federal Reserve System, 281 F.Supp. 899, 905–906 (S.D.N.Y.1968); Zatz v. Hertz, Neumark & Warner, 262 F.Supp. 928, 930–931 (S.D.N.Y.1966); Remar v. Clayton Securities Corp., 81 F.Supp. 1014 (D.Mass.1949). Indeed it is entirely possible that plaintiff's own close association with FSN officers, coupled with his heavy commitment to pay for a large quantity of FSN restricted stock obtained on credit in violation of Regulation T, may itself have contributed to the speculative activity in FSN common stock to the detriment of many small investors, and thus promoted just the sort of market atmosphere the credit regulations seek to prevent. We find no reason to construe either the Act or Regulation to permit such transactions, and decline to narrow the Act as suggested.

### VI.

 Plaintiff's next assertion, that the panel's determination is contrary to fact, rests solely on his quarrel with the finding set forth in the determination of extensive trading activity in FSN stock for plaintiff's customers prior to public announcement by FSN on April 7, 1969, of a new franchising program. The contention is without merit. Plaintiff does not dispute that during the two weeks prior to the franchise announcement his customers purchased 6,500 FSN shares, 5,000 of them by FSN "insiders". This fact could properly be taken into account by the panel in

finding that plaintiff failed to avoid an actual or potential conflict of interest regarding his public customers. Since we find, after reading the hearing record, that the determination was supported by substantial evidence, we may not interfere with it. Consolo v. Federal Maritime Commission, 383 U.S. 607, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966).

Nor do we find plaintiff's suspension of nine months from employment by a member firm and fifteen months thereafter from employment in a supervisory capacity to be excessively severe, and thus to violate due process. The penalty was determined by a panel of plaintiff's professional colleagues, better situated than this court to assess a fair penalty. In the absence of a showing that the panel exceeded its discretion or even a showing that the Exchange has imposed less harsh penalties in other comparable situations, we are not permitted to substitute our own findings. Consolo v. Federal Maritime Commission, *supra.*

## VII.

Plaintiff claims finally that the Exchange's procedures run afoul of Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 16 L.Ed.2d 389 (1963) and that plaintiff's suspension by the Exchange constitutes a refusal to deal in violation of §§ 1 and 2 of the Sherman Act.

Neither assertion has merit. *Silver* held that the limited anti-trust immunity afforded the Exchanges did not exempt them from the requirements of due process in disciplining members. Since we have already found that the proceedings against plaintiff complied with due process requirements, we also find the Exchange did not exceed its self-regulatory authority. The Sherman Act claim must also fail because of our finding that the Exchange's "refusal to deal" with plaintiff was justified by its determination that plaintiff violated Exchange rules.

## VIII.

In considering the issues before us in such detail we do not wish to encourage court review of intra-professional disciplinary proceedings.

For several important reasons, we strongly disapprove of resort to the courts in such matters except, perhaps, in cases of clearly arbitrary or unjust professional determinations, neither of which is presented by the proceeding at hand.

First, intra-professional discipline is best left to the reasoned consideration of the responsible professional administrative tribunals themselves. A long history of determinations by such bodies as the Stock Exchanges or Bar Associations, for example, makes it reasonable to assume that professionals may be expected in the vast preponderance of cases, to judge their colleagues with the same sense of fairness, regard for standards of conduct, attention to ethics and attention to the facts as the courts.

Moreover, such suits as the one at hand require an inordinate expenditure of time and resources for the court and parties and, most important, deprive disciplinary proceedings of finality and blunt their effectiveness.

Even if a court were presented with a considerably more compelling factual record than the one before us, we believe it would be required to grant summary judgment in favor of the defendant. We consider it the responsibility of an attorney to bring suits of this nature in the spirit of Rule 11, Federal Rules of Civil Procedure, only if he is convinced beyond professional doubt that his client has been denied the relevant elements of fairness embodied in the noble concept of due process.

Plaintiff's motion for summary judgment is denied. Defendant's motion for summary judgment is granted.

It is so ordered.