09-0825-ag
Heath v. Securities and Exchange Commission

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

_____

August Term, 2009

(Argued: September 16, 2009                    Decided: November 4, 2009)

Docket No. 09-0825-ag

_____

THOMAS W. HEATH III,

*Petitioner,*

v.

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

_____

B e f o r e :
STRAUB AND WESLEY, *Circuit Judges* AND GARDEPHE, *District Judge.*[*]

_____

Petitioner Thomas W. Heath III appeals from the Opinion and Order of the Securities and

Exchange Commission ("SEC"), affirming the New York Stock Exchange LLC's ("NYSE")

finding that Petitioner violated NYSE Rule 476(a)(6) by disclosing a client's confidential

_____

[*] The Honorable Paul G. Gardephe, United States District Judge for the Southern District
of New York, sitting by designation.

information to a third party. Rule 476(a)(6) – the so-called "J&E Rule" – subjects registered members to disciplinary sanctions for engaging in "conduct or proceeding inconsistent with just and equitable principles of trade." The NYSE found that, although Petitioner did not act in bad faith, he engaged in unethical conduct in violation of the J&E Rule. Petitioner now appeals the SEC's Opinion and Order, arguing that: (1) bad faith, and not mere unethical conduct, was required to sustain the J&E Rule violation; (2) alternatively, if the J&E Rule does in fact prohibit mere unethical conduct in this case, it failed to provide adequate notice that his conduct was sanctionable; and (3) the NYSE improvidently granted summary judgment against him by failing to resolve questions of fact and draw reasonable inferences in his favor. Because we conclude that Petitioner's arguments lack merit, we deny the Petition.

_____

GARY P. NAFTALIS (*on the brief*, Michael S. Oberman, Alan R. Friedman, Joel M. Taylor, Michael B. Eisenkraft), Kramer Levin Naftalis & Frankel, LLP, New York, NY, *for Petitioner*.

DOMINICK V. FREDA, Senior Counsel for the Securities and Exchange Commission (*on the brief*, David M. Becker, General Counsel, Mark D. Cahn, Deputy General Counsel, Jacob H. Stillman, Solicitor, Randall W. Quinn, Assistant General Counsel), Washington, D.C., *for Respondent*.

_____

STRAUB, *Circuit Judge*:

Petitioner Thomas W. Heath III appeals from the Opinion and Order of the Securities and Exchange Commission ("SEC"), affirming the New York Stock Exchange LLC's[1] ("NYSE")

---

[1] Subsequent to the conduct at issue here, the SEC approved proposed rules that transferred the member firm regulatory functions of the New York Stock Exchange, Inc. to the National Association of Securities Dealers, Inc. ("NASD"), which thereafter changed its name to the Financial Industry Regulatory Authority, Inc. *See* SEC Notices, Release No. 34-56145, 72 Fed. Reg. 42169-01, 2007 WL 2186069 (Aug. 1, 2007).

finding that Petitioner violated NYSE Rule 476(a)(6) by disclosing a client's confidential information to a third party.[2] Rule 476(a)(6) – the so-called "J&E Rule" – subjects registered members to disciplinary sanctions for engaging in "conduct or proceeding inconsistent with just and equitable principles of trade." The NYSE found that, although Petitioner did not act in bad faith, he engaged in unethical conduct in violation of the J&E Rule. On appeal to the SEC, Petitioner argued that bad faith is required to sustain a J&E Rule violation. The SEC held that a finding of mere unethical conduct was sufficient to sustain a J&E Rule violation for a breach of confidence and affirmed the NYSE's finding that he violated the Rule by making the disclosure. Petitioner now appeals the SEC's Opinion and Order, principally arguing that bad faith, and not mere unethical conduct, was required to sustain the J&E Rule violation. He argues alternatively that, if the J&E Rule does in fact prohibit mere unethical conduct in this case, it failed to provide adequate notice that his conduct was sanctionable. Finally, he argues that the NYSE improvidently granted summary judgment against him by failing to resolve questions of fact and draw reasonable inferences in his favor. Because we conclude that Petitioner's arguments lack merit, we deny the Petition.

**BACKGROUND**

I.     **Factual Background**

Petitioner joined J.P. Morgan Securities as an investment banker in its Financial Institutions Group in 1992, where he advised financial institutions in connection with mergers and acquisitions. He ultimately became a Managing Director and remained with J.P. Morgan

---

[2] The NYSE censured Petitioner and fined him in the amount of $100,000. Petitioner appeals only the liability determination and not the sanction.

3

until 2005.

Hibernia Bank was a client of J.P. Morgan. Petitioner covered the account for nine years. Petitioner testified that he was close to the CEO of Hibernia, both professionally and personally. Through this relationship, he secured J.P. Morgan's engagement as Hibernia's financial advisor in connection with its merger with Capital One Corp. Hibernia "formally engaged" J.P. Morgan in this capacity on February 25, 2005.

In mid-January of that year, Antonio Ursano, Global Head of Bank of America's Financial Institutions Group, contacted Petitioner, unsolicited, and proposed that Petitioner join Bank of America as the sole head of its bank group. Petitioner met with him and initially indicated he was not interested. They met again, at Ursano's insistence, and Ursano offered Petitioner a job for two years at $3 million per year, with the understanding that he would be promoted within the year to succeed Ursano as head of Bank of America's Financial Institutions Group. Petitioner said that he would consider it, and, on February 13, 2005, he gave Ursano a verbal commitment to join Bank of America (pending a written agreement).

Ursano asked Petitioner to begin in one week, but Petitioner said "that he was working on a large transaction which he felt he needed to complete both in the interest of his client and of his current employer." He did not disclose any further details regarding the "transaction" at that time. While he did not say so explicitly to Ursano, Petitioner was referring to the Hibernia and Capital One merger. Petitioner believed that leaving J.P. Morgan without closing the Hibernia and Capital One deal would be disruptive to the transaction, and to Hibernia particularly.

On February 18, Petitioner informed Tim Main, his supervisor at J.P. Morgan, that he

4

intended to join Bank of America, but that he would stay at J.P. Morgan to secure the Hibernia engagement and "get the deal across the finish line." Main agreed that it was the "honorable" thing to do. Petitioner emphasizes that he had no monetary interest in completing the acquisition at J.P. Morgan and he intended to forfeit any deal-based bonus by resigning prior to fiscal year end.

Ursano asked Petitioner to meet Eric Corrigan, the then-head of Bank of America's Depository Institutions Group, who would have reported to Petitioner upon his arrival. They met on February 23. The purpose of their meeting was to get acquainted with each other and to begin developing a working relationship. They did not discuss Hibernia at this meeting. Petitioner testified that Corrigan seemed to think that they were going to be co-heads of the bank group and not that Petitioner was coming on as the sole head.

Two days later, on February 25, Petitioner received an offer letter from Bank of America, which stated that he would join as a Managing Director and head of banks for the Financial Institutions Group (reporting to Ursano, who was the head of the Financial Institutions Group) with compensation of approximately $6 million over two years.

On March 1, Ursano asked Petitioner to discuss with Corrigan how they were going to work out coverage on their joint accounts, and to assure Corrigan that he was a "decent guy" and a "good partner" who was "not going to stomp all over him" on those accounts. Petitioner and Corrigan had a phone conversation that day during which Petitioner made suggestions about how Corrigan could get involved in Petitioner's accounts and invited Corrigan to meet with a number of his clients. Petitioner testified that his objective was to "build [Corrigan] up" and to let him

5

know that he had heard "nice things" about him from clients, and that he would be "there to help out" if Corrigan needed it.

Near the end of this conversation, Corrigan asked about Petitioner's pending transaction, stating that "there are a lot of rumors out in the marketplace. And [we] . . . know you have a bank deal somewhere down in the south." Petitioner testified that he initially refused to divulge any information regarding the Hibernia acquisition, but eventually responded: "if you really want to know, I will tell you exactly what it is, but you have to understand, you know, I've got a week to go. This is obviously confidential information. The deal is done, bankers have been hired, nothing is going to change. And you just have to understand and respect that." Corrigan replied, "well, are you comfortable telling me?" Petitioner responded, "the real question is, are you comfortable with me telling you because you're the one that can't act on this in any way." Corrigan replied, "I can understand that, I can keep a secret." At that point, Petitioner disclosed that Capital One was acquiring Hibernia; J.P. Morgan was representing Hibernia in the deal; forty-five percent of the deal was being funded with cash; the deal had been in motion before January; and Hibernia believed that Capital One's price-to-earnings ratio was sufficiently low that it gave Hibernia a "degree of comfort with the stock."

Petitioner testified that he disclosed this information to Corrigan for "a couple of reasons":

> I think that you have to understand that I was talking to someone
> who, as the gray area merged, was increasingly more of a
> colleague. And I realize that that is technically not what was going
> on, but the whole gist of the conversation was business going
> forward. The – the – you know, the conversation itself, I had

6

mentioned that, you know – I said, well, there's a good marketing piece that we'll talk about going forward. . . . I'm dealing with someone who's going to be a colleague. I'm dealing with someone who the whole purpose of this thing is to build trust and – and build a collegiality with. I'm – the conversation has gone more towards marketing and this deal had direct relevance. The final thing that I will tell you is when he says they are hearing rumors and they know I've got something in the south, I mean, my forehead just beaded up with sweat, I'm terrified. And my view was – that I basically put a firewall around the problem and I sincerely believe that. And I know in hindsight that is incredibly stupid particularly given what happened. But understand, I knew with 100 percent certainty there was zero role for – for B of A in that deal, zero.

Throughout his testimony, Petitioner emphasized that he was attempting to prevent Corrigan and others at Bank of America from "snooping" around the deal. As he put it, he was attempting to "put a firewall around the problem."

Corrigan confirmed to Petitioner that he understood that he could not act on the information in any way, and Petitioner believed that Corrigan, an experienced industry professional and future colleague, would keep the information confidential as he had promised. That same day, however, Corrigan disclosed the information to Thomas Chen, the head of Bank of America's Diversified Financial Services Group. Chen in turn left a voicemail message for the head of Capital One's mergers and acquisitions group, inquiring whether there was a role for Bank of America on the deal.

On March 3, while Petitioner was in a meeting at Bank of America, Corrigan invited Petitioner to stop by his office. During their conversation, Corrigan asked Petitioner how the Hibernia deal was going and whether there was room for another advisor on the merger. Petitioner testified that he was emphatic in saying that there was no way that could happen and

7

that he thought he had made that "abundantly clear" in their prior conversation and he was shocked that Corrigan even asked. He made clear that "it's Morgan and Bear Sterns [at Hibernia] and at Capital One it's Credit Suisse First Boston and nothing is going to change." Corrigan made no mention of the call to Capital One or the fact that he disclosed the information to Chen.

On March 6, the merger agreement between Hibernia and Capital One was signed and announced by *The Wall Street Journal*. The total transaction was valued at approximately $5.3 billion, representing a 24% premium or approximately $1 billion over the closing price of Hibernia shares on Friday, March 4. As Petitioner had disclosed to Corrigan, Credit Suisse First Boston acted as financial advisor to Capital One, and J.P. Morgan and Bear Stearns acted as financial advisors to Hibernia (with J.P. Morgan as the lead advisor). Neither the terms of the deal nor the parties' financial advisors had changed since Petitioner's March 1 conversation with Corrigan.

That same day, Alex Lynch, a colleague of Petitioner's from J.P. Morgan, informed Petitioner that there was "a problem." He said that Capital One received a call from Bank of America in an attempt to get itself retained, armed with "very explicit information" about the merger with Hibernia. Lynch said that "they had everything. . . . it was as if you had handed them a term sheet and they used it. . . . [W]hen we connected the dots and add it all up, it points directly at you." Petitioner was immediately put on leave.

Petitioner spoke to Corrigan that day and told him that a colleague from J.P. Morgan had told Petitioner that Bank of America approached Capital One in an attempt to get itself retained

with specific details of the merger. Corrigan denied disclosing the information. Petitioner did not tell Corrigan at this point that he was put on leave. The next day he asked Corrigan again. This time Corrigan said that he "kind of did" disclose the information. Corrigan denied revealing Hibernia's role in the merger to Chen, but admitted that he suggested to Chen that the rumors that Capital One was involved in a merger were true. Petitioner then spoke to Chen, and Chen said that when he called Capital One, he mentioned only that he was aware that Capital One was involved in a bank deal.

Petitioner disclosed the entire situation to Ursano at Bank of America and recommended that he "elevate this internally to the top of the house immediately." Over the next two days, a Bank of America investigative team interviewed Corrigan, Chen and Petitioner, and, on March 1, Bank of America's counsel informed Petitioner's counsel that Bank of America believed that Petitioner did not act with any devious or malicious intent, but had made an error in judgment. On March 15, 2005, Bank of America "revoked" its offer of employment to Petitioner and fired Corrigan and Chen. J.P. Morgan had fired Petitioner the day before.

**II.    NYSE Proceedings**

On January 25, 2006, the NYSE Division of Enforcement ("Enforcement") charged that Petitioner's disclosure violated NYSE Rule 476(a)(6), which prohibits conduct inconsistent with just and equitable principles of trade. Enforcement filed a motion for summary judgment on October 18, 2006, and Petitioner filed a competing motion on October 26, 2006. On November 24, 2006, the NYSE Hearing Board ("Hearing Board") granted summary judgment on liability

against Petitioner, finding that he violated the J&E Rule by making the disclosure to Corrigan.[1]

First, the Chief Hearing Officer cited NYSE Rule 476(c), which grants a hearing officer the authority to "resolve any and all procedural and evidentiary matters and substantive legal motions." *In the Matter of NYSE Disciplinary Proceedings Against Thomas W. Heath, III*, NYSE Hearing Bd. (Nov. 24, 2006), SPA at 23.[2] She concluded that "[t]his includes the authority to consider and, if warranted, grant a motion for summary judgment." *Id.* She held that "[a] Hearing Officer's power to decide a summary judgment motion under NYSE Rule 476(c) is analogous to that of a federal court deciding a summary judgment motion under Rule 56." *Id.* at 24.

The Chief Hearing Officer explained that Petitioner's main argument is that "to prevail on its charge . . . , Enforcement must show that [he] acted in bad faith." *Id.* at 25. She disagreed, holding that "[a] violation of the just and equitable principles of trade codified by NYSE Rule 476(a)(6) may occur either through bad faith or unethical conduct." *Id.* She cited several SEC decisions for this proposition and concluded that "the concept of unethical conduct is different from–namely, that it is broader than–bad faith." *Id.*

The Chief Hearing Officer then found that by disclosing confidential information, Petitioner had acted unethically. She reasoned: "There is no dispute that the information that [Petitioner] disclosed to Corrigan included sensitive, nonpublic details of a transaction that had not yet been consummated. . . . It is commonly accepted that when a financial advisor takes on

---

[1] A single hearing officer issued the summary judgment decision.

[2] SPA refers to the Special Appendix submitted by Petitioner in support of his brief.

work that requires the communication of such sensitive, nonpublic information from the client to the advisor, the client has an expectation that the advisor will keep that information confidential." *Id.* at 27. She noted that "[i]t is undisputed that [Petitioner's] employer had a Code of Conduct that spelled out the duties of an employee to keep confidential certain sensitive information learned on the job." *Id.* at 27. She concluded:

> But the duty of confidentiality at issue here stems not only from the explicit Code of Conduct, but also from the ethical obligation to which every financial advisor becomes subject upon learning of sensitive, nonpublic information about a client in the normal course of business. It is a duty that should be self-evident to any experienced financial professional. By disclosing confidential information about the pending transaction to someone who, at the time of the disclosure, was an employee of a competitor firm, [Petitioner] breached the duty that he owed to his client and thereby violated the just and equitable principles of trade.

*Id.* (footnote omitted).

In support of his summary judgment motion, Petitioner submitted a letter, dated February 10, 2006, from Randall Howard, Hibernia's President of Commercial Banking and a member of its board of directors at the time of the merger with Capital One. The letter stated:

> I am comfortable and confident in [Petitioner's] judgment that his disclosure to a B of A subordinate was made in strict confidence with no intention that the individual would breach that confidence in any way. Moreover, at the point of the disclosure all terms of the transaction and hiring of bankers had been finalized, and the deal was in effect completed. Given the circumstances, I do not view Tom's discussion as a breach of our confidence. Had we known about this at the time, there is no remedial or regulatory action we would have sought.
>
> I have known Tom for many years. He has always been an honest, straightforward banker, and our thoughts of him are evidenced by the fact that we looked to him as our advisor for our most

important transaction. I absolutely would work with Tom again should the opportunity present itself and entrust him with the most guarded of confidences. His year-long absence from the industry leaves a large gap which has not been filled.

The Chief Hearing Officer noted that the "letter was prepared and submitted long after the breach occurred and apparently in the executive's personal capacity, rather than on behalf of the client." *Id.* at 27-28 n.3. She concluded, "In the absence of any contemporaneous waiver by his client, [Petitioner]'s obligation to maintain the confidentiality of his client's information is unaffected." *Id.* She also found that there was no competing obligation or equitable excuse to justify Petitioner's action. She explained:

> Nothing in the record would indicate that [Petitioner], in the instant matter, was under any competing obligation to make the disclosures that he did or that any "equitable excuse" relieved him of his ethical obligation to keep the information confidential. Rather, his reasons for making the disclosures–while certainly lacking any malevolent or deceitful quality–were, in the final analysis, self-serving in that they were intended to gain the trust of, and thereby smooth things over with, a soon-to-be colleague. [Petitioner] admits that he made the disclosures, at least in part, to make Corrigan "understand that he was going to be a good partner and that he was not going to 'stomp all over him.'" On the record before me, I cannot find anything that excuses the unethical conduct in which [Petitioner] engaged.

*Id.* at 29 (citation and footnote omitted).

In a footnote, the Chief Hearing Officer also dismissed Petitioner's explanation that he made the disclosures in order to preempt Corrigan from "snooping" around the deal and acting on the information in the market place. She wrote:

> Even assuming it were true, as I must for purposes of deciding Enforcement's Motion, I do not find that this concern rises to the

level of a competing obligation or "equitable excuse" that absolves [Petitioner] of his breach of confidentiality. On the contrary, if [Petitioner] suspected that Corrigan might "snoop around the deal" for the purposes of "acting on information in the market place," [Petitioner] could have–and, indeed, should have–taken other steps to prevent such a result, such as alerting his current and future employers, as well as his client, to his suspicions. If anything, those suspicions regarding Corrigan should have made [Petitioner] even more reluctant to divulge sensitive information to his would-be colleague and, thus, only served to heighten [Petitioner]'s ethical obligation to safeguard his client's confidential information against incursion by this potentially untrustworthy individual.

*Id.* Finally, the Chief Hearing Officer rejected Petitioner's argument that summary judgment should not be granted because neither his former firm nor his former client were injured as a result of the disclosure. She wrote, "There can be no question that the disclosures that [Petitioner] made did have the potential for unraveling the deal. Had that occurred, many investors could have been harmed–not merely [Petitioner]'s client or his firm, but also the shareholders of those organizations." *Id.* at 30. She granted summary judgment against Petitioner, finding him guilty of violating the J&E Rule, and indicated that the penalty would be imposed after a hearing at a future date.

Thereafter, a NYSE Hearing Panel ("Panel") was convened to hear evidence and argument concerning the penalty to be imposed. It heard testimony of several witnesses, namely, a then-current managing director at J.P. Morgan who was Petitioner's colleague, Randall Howard (the former member of Hibernia's board of directors who wrote the letter discussed *supra*), an attorney who was a close colleague of Petitioner and worked as general counsel and as an investment banker at J.P. Morgan, and Petitioner himself. Petitioner testified, in particular, that

13

the disclosure came in the last two minutes of a forty-one minute telephone conversation, while he was packing his bags in a hotel room.

Enforcement argued for a penalty of censure, a six-month bar and a $200,000 fine. It maintained that this was a case of first impression, in which an investment banker had disclosed a client's confidential information and, therefore, "there is no relevant precedent to aid the Panel." It emphasized that (1) Petitioner's breach was not a mistake; (2) after his breach, he did nothing to alert J.P. Morgan or Hibernia; (3) at the time of the breach, there was potential for harm, such as an unraveling of the deal or volatility in the market; (4) as an experienced investment banker, he should have known better than to disclose confidential, non-public information; (5) a less severe penalty would not deter others similarly situated; and (6) given the large amount of income he was earning, $200,000 was a relatively small fine.

Petitioner, for his part, argued that his disclosure did not cause any harm and the potential for harm was low because the deal was finalized, and that he was not personally enriched by his disclosure. He emphasized that he had already incurred a very high personal cost, including the loss of a minimum annual income of $3 million for 2005 and 2006 and his inability to find work in the twenty-two months following the incident. He contended that he did not act in bad faith, nor was there any evidence of such; rather, his disclosure was "a spontaneous thing that happened in the 38th or 39th minute of a 41-minute conversation . . . where he was kind of blindsided . . . [because] he didn't expect this to come up, had never anticipated it coming up, [and] never planned on having this conversation." Finally, he pressed that he had been, at all times, candid and forthcoming during the investigation and disciplinary proceedings surrounding

14

his disclosure. Petitioner argued that, under these circumstances, a letter of admonition would be most appropriate.

After the hearing, the Panel issued its decision dated March 15, 2007. The Panel found "the nature of the violation in this case to be very serious, warranting a serious penalty." *In the Matter of Thomas Woodley Heath, III, Former Registered Representative*, NYSE Hearing Bd. Decision 07-25, 2007 WL 3408256, at *4 (Mar. 15, 2007). It emphasized the potential of harm that the disclosure had, but found that, comparatively speaking, the risk was small given the advanced stage of the deal.

The Panel also found that Petitioner "lacked any bad faith." *Id.* at *5. It explained that Petitioner "only shared the confidential information with [Corrigan] after making the latter promise that he would not share it with anyone else, and [Petitioner] had every reason to believe that [Corrigan] would keep his promise." *Id.* It credited Petitioner's testimony that he made the disclosure without "premeditation" and only as a result of a "momentary lapse in judgment." *Id.* It found that Petitioner "used poor judgment and was motivated by a desire to gain the trust of a future colleague," but "was not motivated by any improper goal of personal enrichment, nor did he obtain any." *Id.* at *6. Finally, the Panel emphasized that Petitioner's wrongdoing stemmed from a single act of indiscretion against a backdrop of an otherwise unblemished career. It found that Petitioner was not likely to repeat his mistake. Accordingly, it concluded that a $200,000 fine was punitive, and instead imposed a penalty of censure and a $100,000 fine.

In a two paragraph decision dated October 17, 2007, the NYSE Board of Directors affirmed the Chief Hearing Officer's summary judgment decision and the penalty imposed by the

15

Panel. On November 15, 2007, Petitioner filed an appeal with the SEC. *See* 15 U.S.C. § 78s(d)(2).

**III.    SEC Opinion**

Petitioner advanced three arguments to the SEC on appeal. Specifically, he argued that: (1) the J&E Rule requires a finding of bad faith; (2) alternatively, he did not receive fair notice that his conduct was sanctionable under the J&E Rule; and (3) the NYSE erred by determining his guilt on a motion for summary judgment. The SEC rejected all three of his arguments and affirmed the NYSE's decisions. *See In the Matter of the Application of Thomas W. Heath, III*, Release No. 59,223, 94 S.E.C. Docket 3466, 2009 WL 56755 (Jan. 9, 2009).

**A.    Bad Faith Argument**

First, the SEC held that it has "long applied a disjunctive 'bad faith or unethical conduct' standard to disciplinary action under the J&E Rule." *Id.* at *4. It explained:

> This rule incorporates "broad ethical principles," and focuses on the "ethical implications of the [a]pplicant's conduct." The rule serves as an industry backstop for the representation "inherent in the relationship," between a securities professional and a customer, "that the customer will be dealt with fairly, and in accordance with the standards of the profession."
>
> Promulgated to discipline "a wide variety of conduct that may operate as an injustice to investors or other participants in the marketplace," the J&E Rule focuses on the securities professional's conduct rather than on a subjective inquiry into the professional's intent or state of mind. Accordingly, a violation of the rule need not be premised on a motive or scienter finding. . . .
>
> [Petitioner]'s breach of confidentiality violated one of the most basic duties of a securities professional, a duty that is grounded in fiduciary principles and reflected in the [J.P. Morgan] Code of

16

Conduct.

*Id.* at *4-5 (footnotes omitted).

## B.  Fair Notice Argument

In the alternative, Petitioner argued to the SEC that he lacked notice that the J&E Rule could subject him to discipline for unethical conduct that was not motivated by bad faith.  The SEC held that "[a]s an experienced investment banker, [Petitioner] can be fairly charged with notice that his breach of his duty to maintain the confidentiality of his client's information violated the just and equitable principles of trade." *Id.* at *7.  It further noted that Petitioner was on actual notice given that the J.P. Morgan Code of Conduct prohibited him from making such disclosures.  The SEC emphasized that Petitioner testified that he had read the Code of Conduct and acknowledged that "one of the factors that creates a successful M&A banker is . . . having the judgment of how to use [confidential information] and how to use it in a trustworthy and honest way." *Id.* at *7 (internal quotation marks omitted; alterations in original).

## C.  Summary Judgment Argument

Finally, Petitioner argued to the SEC that the Chief Hearing Officer erred in granting Enforcement's motion for summary judgment because she did not resolve questions of fact and draw reasonable inferences in his favor.  The SEC rejected this argument because it itself had "conducted a de novo review of the record." *Id.* at *10.  In particular, it indicated that "[t]he record includes [Petitioner]'s on-the-record testimony taken by the Division during its investigation, and [Petitioner]'s testimony before the NYSE Hearing Panel during the penalty phase of the NYSE hearing." *Id.*  Moreover, the SEC highlighted the fact that Petitioner "does

17

not contest the material facts underlying the NYSE's finding of a violation of the rule, i.e., his disclosure of material non-public information regarding the pending merger of his client and the circumstances surrounding his conversation with Corrigan." *Id.*

Petitioner now appeals the SEC's Opinion and Order. *See* 15 U.S.C. § 78y(a).

**DISCUSSION**

"In reviewing the SEC's opinion and order, we must affirm '[t]he findings of the Commission as to the facts, if supported by substantial evidence.'" *MFS Secs. Corp. v. SEC.*, 380 F.3d 611, 617 (2d Cir. 2004) (quoting 15 U.S.C. § 80b-13(a)). "The Administrative Procedure Act, which applies to our review of Commission orders, provides that a reviewing court shall 'hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)." *Id.* (internal citation omitted).

**I.      Is Bad Faith Required for a J&E Rule Violation?**

Petitioner's first argument is that a finding of bad faith is required for a J&E Rule violation, citing several SEC decisions and our decision in *Buchman v. SEC*, 553 F.2d 816 (2d Cir. 1977). It is clear, however, that the J&E Rule is concerned with enforcing ethical standards of practice in the securities industry and is violated by a breach of confidence if such breach amounts to unethical conduct.

The NYSE is a national securities exchange registered with the SEC pursuant to section 6 of the Securities Exchange Act of 1934, as amended ("Exchange Act"), 15 U.S.C. § 78f, *see Barbara v. N.Y. Stock Exch., Inc.*, 99 F.3d 49, 51 (2d Cir. 1996), and, as such, is a "self-

18

regulatory organization" ("SRO"), *see* 15 U.S.C. § 78c(a)(26). It therefore has a duty to promulgate and enforce rules governing the conduct of its members. *See id.* §§ 78f(b), 78s(g); *see also Barbara*, 99 F.3d at 51. These rules are subject to SEC approval, *see* 15 U.S.C. § 78s(b); *Barbara*, 99 F.3d at 51, and must be "designed to . . . promote just and equitable principles of trade," 15 U.S.C. § 78f(b)(5).

While Congress enacted the Exchange Act to prohibit fraudulent practices in the securities industry, it recognized that such legislation "must be supplemented by regulation on an ethical plane in order 'to protect the investor and the honest dealer alike from dishonest and unfair practices by the submarginal element in the industry' and 'to cope with those methods of doing business which, while technically outside the area of definite illegality, are nevertheless unfair both to customer and to decent competitor, and are seriously damaging to the mechanism of the free and open market.'" VI Louis Loss & Joel Seligman, Securites Regulation 2796 (3d ed. 2002) (quoting S. Rep. No. 75-1455 at 3 (1938); H.R. Rep. No. 75-2307 at 4 (1938)); *see also Avery v. Moffatt*, 55 N.Y.S.2d 215, 228, 187 Misc. 576, 592 (Sup. Ct. 1945) ("[S]ecurities trading is a highly complex field in which it is not always feasible to define by statute or by administrative rules having the effect of law every practice which is inconsistent with the public interest or with the protection of investors. As a result there is a large area for the operation of Exchange rules on the level of business ethics rather than law, and in that sphere the statute leaves it to the Exchanges to carry on the necessary work of prevention and discipline."). Such "[r]egulation of the *ethics* of an industry means a substantial degree of *self*-regulation, properly supervised by government." Loss & Seligman, *supra*, at 2796; *see also Silver v. N.Y. Stock*

19

*Exch.*, 373 U.S. 341, 352-53 (1963) (discussing Congress's intent for SROs to police the securities industry to reform unethical practices in the industry). Thus, in accordance with the Exchange Act, 15 U.S.C. § 78f(b)(5), the NYSE adopted, with the approval of the SEC, the J&E Rule, which prohibits registered members from engaging in "conduct or proceeding inconsistent with just and equitable principles of trade."

It has long been the view that the J&E Rule is designed to enable SROs to regulate the ethical standards of its members. *See, e.g.*, Loss & Seligman, *supra*, at 2809 n.30. SEC precedent is clear on this point. In *In the Matter of Benjamin Werner*, 44 S.E.C. 622, 1971 WL 120499 (July 9, 1971), the SEC rejected the petitioner's argument that NASD's J&E Rule[3] could only be violated by an unlawful act. The SEC noted, "We have long recognized that [the J&E Rule] is not limited to rules of legal conduct but rather that it states a *broad ethical principle* which implements the requirements of Section 15A(b)" of the Exchange Act. *Id.* at *2 n.9 (emphasis added). It explained that "the NASD through its disciplinary powers can and should play an important role in improving the ethical standards of its members, subject always to their rights to obtain review by this Commission and the courts." *Id.* at *2; *see also In the Matter of the Application of William F. Rembert*, 51 S.E.C. 825, 1993 WL 483197, at *1 n.3 (Nov. 16, 1993) ("We have long recognized that [the NASD J&E Rule] *states broad ethical principles* . . . . Section 15A(b)(6) of the Exchange Act empowers self-regulatory organizations, such as the NASD, to discipline their members for unethical behavior, as well as violations of law."

---

[3] NASD's J&E Rule, Rule 2110 (previously Article III, § 1), provides: "A member, in the conduct of its business, shall observe high standards of commercial honor and just and equitable principles of trade."

(emphasis added)); *In the Matter of the Application of Timothy L. Burkes*, 51 S.E.C. 356, 1993 WL 119769, at *3 (Apr. 14, 1993) ("As the Commission has stated previously, disciplinary hearings to require compliance with 'high standards of commercial honor and just and equitable principles of trade' are ethical proceedings; hence the concern is with ethical implications of the Applicant's conduct.").

Directly on point is *In the Matter of the Application of Robert E. Kauffman*, 51 S.E.C. 838, 1993 WL 483323 (Nov. 18, 1993), *aff'd*, *Kauffman v. SEC*, 40 F.3d 1240 (3d Cir. 1994). There, the SEC affirmed NASD's findings that the petitioner violated NASD's J&E Rule by misrepresenting to NASD and to the Pennsylvania Securities Commission that he had received a bachelor's degree. *Id.* at *1. The petitioner argued that his misrepresentation was accidental and not in bad faith. *Id.* at *2. Although the SEC ultimately found that the petitioner had acted in bad faith, it rejected his argument that the J&E Rule required a finding of scienter. *Id.* It wrote:

> Kauffman argues that, in order to find liability under [NASD's
> J&E Rule], we must find scienter. We disagree. We have long
> recognized that [NASD's J&E Rule] states a broad ethical
> principle that implements the requirements of Section 15A(b) of
> the Securities Exchange Act of 1934 . . . . The most that is required
> is a finding of bad faith *or unethical conduct*. Although Kauffman
> implies that the securities laws are designed solely for protection
> from fraud, and not merely unethical behavior, Section 15A(b)(6)
> of the Securities Exchange Act of 1934 empowers self-regulatory
> organizations, such as the NASD, to discipline their members for
> violations of just and equitable principles of trade.

*Id.* at *2 n.5 (emphasis added; internal citations omitted).

Similarly, in *In the Matter of the Application of Calvin David Fox*, 81 S.E.C. Docket 1511, 2003 WL 22467374 (Oct. 31, 2003) ("*Fox I*"), the SEC reviewed the NYSE's finding that

the petitioner had violated the J&E Rule by making a misstatement to his member firm employer about the status of his license to practice law in the State of Florida and by submitting an altered copy of an order of the Florida Supreme Court to support the misstatement. *Id.* at *1. The petitioner argued that his statement that he was in good standing reflected his good faith legal opinion that his license suspension was stayed while the court considered his motion for rehearing. *Id.* at *2. He also contended that his submission of the altered order to his employer was inadvertent, and that he had intended to send it only to his family. *Id.* The SEC noted that "[w]ith respect to a charge that conduct was inconsistent with just and equitable principles of trade, we have held that a self-regulatory organization need not find that the respondent acted with scienter, but must find that the respondent acted in bad faith *or unethically*." *Id.* at *3 (emphasis added).[4]

In *In the Matter of the Application of Paul K. Grassi, Jr.*, 86 S.E.C. Docket 1954, 2005 WL 3199274 (Nov. 30, 2005), the SEC addressed the proper interpretation of NYSE Rule 476(a)(7), which prohibits members from engaging in "acts detrimental to the interest or welfare of the [NYSE]." *Id.* at *1 & n.1. In so doing, it drew upon its Rule 476(a)(6) jurisprudence, writing:

> Rule 476 states broad ethical principles that implement the requirements of Section 6(b) of the Exchange Act which, among other things, empowers self-regulatory organizations to discipline their members for unethical behavior as well as violations of law.

---

[4] In *Fox I*, the NYSE did not make findings with respect to whether Fox acted in bad faith or unethically, and thus the SEC remanded for it to make such findings. *Fox I*, 2003 WL 22467374, at *3.

22

In reviewing allegations that conduct is inconsistent with just and equitable principles of trade, we have held repeatedly that a self-regulatory organization's disciplinary authority is broad enough to encompass conduct that does not involve a security if that conduct reflects on a person's ability to comply with the regulatory requirements of the securities industry and to fulfill his fiduciary duties. . . . We have held that scienter is not required to establish a violation of such rules and that the most that is required is a finding of bad faith or unethical conduct.

*Id.* at *3, *4 n.8 (footnotes omitted); *see also In the Matter of Dep't of Enforcement v. Shvarts*,

No. CAF980029, 2000 NASD Discip. LEXIS 6, at *16, 21 (June 2, 2000) ("'Bad faith' in the

sense of malicious intent or deceitfulness need not be established. . . . [E]ven if the violation of

the court order were not in itself a violation of [the J&E Rule], Shvarts' conduct would still be

violative because it was unethical.").

Courts have echoed this principle. As early as 1966, Judge Friendly noted that the J&E

Rule is "something of a catch-all which, in addition to satisfying the letter of the statute,

preserves power to discipline members for a wide variety of misconduct, including merely

unethical behavior." *Colonial Realty Corp. v. Bache & Co.*, 358 F.2d 178, 182 (2d Cir.), *cert.*

*denied*, 385 U.S. 817 (1966). The Ninth Circuit has held the same. *See Erdos v. SEC*, 742 F.2d

507, 508 (9th Cir. 1984) ("An NASD violation does not require that the dealer act with

scienter."); *see also generally Alderman v. SEC*, 104 F.3d 285 (9th Cir. 1997). The J&E Rule's

concern with unethical conduct is consistent with the NYSE rules' "special focus" on the

"professionalization of the securities industry." *Gustafson v. Strangis*, 572 F. Supp. 1154, 1158

(D. Minn. 1983).

Despite this substantial authority, Petitioner points to our decision in *Buchman v. SEC*,

23

553 F.2d 816 (2d Cir. 1977), as well as SEC precedent stating that bad faith is required for a breach of contract to violate the J&E Rule. These cases are inapposite.

First, we should note that prior to our decision in *Buchman*, SEC precedent held that a breach of *contract* violated the J&E Rule when the breach "was unethical or dishonorable." *In the Matter of Samuel B. Franklin & Co.*, 38 S.E.C. 113, 1957 WL 52433, at *3 (Nov. 18, 1957); *see also In the Matter of the Application of S. Brokerage Co., Inc.*, 42 S.E.C. 449, 1964 WL 66923, at *3 (Nov. 19, 1964) ("But even if we were to assume that applicant were chargeable with a breach of its contract, it would not necessarily follow that it had violated the rule, for 'not every failure to perform a contract violates the NASD rule; it must also appear that such failure was unethical or dishonorable' or that the breach was committed 'without equitable excuse or justification.'" (footnote omitted)).

In 1977, this Court decided *Buchman*, in which we vacated an SEC order sanctioning a broker-dealer for violating NASD's J&E Rule. 553 F.2d at 818. The broker-dealer in *Buchman*, Shaskan & Co., Inc., refused to honor the terms of a purchase agreement with another broker-dealer for the sale of stock in a company called Crystalography. *Id.* The SEC had suspended trading in Crystalography's stock out of concern for fraud. *Id.* The SEC's rule at the time was that when it imposed such a suspension on trading, a broker could not complete contracts to accept delivery of the affected stock unless "he has *no* reason to believe" that the other party is connected with the fraudulent activity. *Id.* (emphasis added). While the SEC had lifted the suspension on Crystalography stock when the other broker-dealer attempted to deliver the stock in the company to Shaskan, the SEC issued a statement that "broker-dealers should take the

24

necessary measures to assure themselves that they are not unknowingly effecting a consummation of open contracts which may be in furtherance of a scheme to manipulate the price of the securities of Crystalography or would otherwise violate the Federal securities laws." *Id.* at 819. Shaskan requested clarification from the SEC as to its obligation to ensure that the other broker-dealer was not involved in fraud and refused to accept trades of the stock until it received such clarification. *Id.* In the meantime, Shaskan's capital position had become impaired, and the NYSE directed it to fulfill open contracts with its customers. *Id.* The firm never accepted the Crystalography shares, however, and NASD brought charges against it for failing to do so. *Id.* at 819-20. The SEC sustained NASD's finding that Shaskan and its principals did not "observe high standards of commercial honor and just and equitable principles of trade" when they refused to honor the contract. *Id.* at 820.

We vacated the SEC's order, writing:

> With deference to the Commission, we believe that under the circumstances of this case, Shaskan's refusal to complete the Muir transactions during and after the suspensions, was colorably justified by the confusion as to the true state of the market and as to the applicable law. By this we do not mean that Shaskan necessarily has a defense to a claim by Muir for breach of contract. But, as the Commission concedes, it is well-settled that "a breach of contract between NASD members is of no concern to the NASD or to the Commission if such breach does not contravene the ethical standards embodied in Article III, Section 1." The Commission itself has held that a refusal to complete a contract based on a reasonable belief that a transaction was part of a manipulative scheme does not violate Article III, Section 1. There are, of course, situations in which this claim is a sham, and if it is found that "petitioner did not have a belief both honest and reasonable that there was a manipulative scheme afoot at the time of the contractual default," its failure to fulfill contractual obligations would violate Article III, Section 1. The touchstone, in

25

other words, is good faith – the ultimate test of violation of an ethical standard. *A breach of contract is unethical conduct in violation of NASD Rules only if it is in bad faith*, just as conduct violates rule 10b-5 only if there is scienter:  intent to deceive, manipulate or defraud.  The measure of culpability then becomes whether appellants were in good faith.

Appellants here . . . were put on notice by the Commission itself that there had actually been unlawful manipulation of the price of Crystalography stock.  And, as we have seen, the Commission itself notified the broker-dealers in the public release lifting the seven-month old suspension of trading, Release No. 10156, that there was a real possibility of a spill-over of the unlawful activity with respect to open contracts.  The release warned brokers "to assure themselves that they are not unknowingly effecting a consummation of open contracts which may be in furtherance of a scheme to manipulate the price of securities of Crystalography."  . . . [T]here can be no doubt of appellants' bona fide belief "that there was a manipulative scheme afoot" and that, based upon the warning issued by the Commission after the suspension was lifted, the manipulative scheme still affected open contracts.  This record does not support a conclusion that appellants were snatching excuses out of thin air.  They were bound to cooperate with the Commission in refusing to accept stock which would succeed in bringing the fruits of manipulation to a guilty seller.

. . .

A broker, confronted with an atmosphere of manipulation or insider trading, faces a real dilemma. He risks a breach of contract action if he refuses to accept delivery, but he risks other sanctions if he accepts delivery in the face of publicly proclaimed suspicions of Securities Act violations which permeate the scene.

The evidence should be truly substantial to support a finding that, in such circumstances, when there is evident manipulation, the broker has wilfully used the situation in a fraudulent effort to avoid his contractual obligation.  This is especially true when the alleged ethical misconduct is based on a single transaction and does not even purport to show a course of unethical business practice.  We see nothing in our decision which would encourage truly unethical practices or would lower the standards of compliance.

26

Accordingly, we grant the petition. The Commission order is vacated.

*Id.* at 820-21, 824 (emphasis added; internal citations and footnotes omitted).

*Buchman* is entirely distinguishable from this case. As the Chief Hearing Officer found in the present case, "[n]othing in the record would indicate that [Petitioner], in the instant matter, was under any competing obligation to make the disclosures that he did or that any 'equitable excuse' relieved him of his ethical obligation to keep the information confidential." *In the Matter of NYSE Disciplinary Proceedings Against Thomas W. Heath, III*, NYSE Hearing Bd. (Nov. 24, 2006), SPA 29; *see also supra* **[pp. 12-13]**. Specifically, the Chief Hearing Officer found that Petitioner acted for self-serving reasons, i.e., to build a relationship with Corrigan, and dismissed Petitioner's explanation that he made the disclosures in order to preempt Corrigan from "snooping" around the deal and acting on the information in the market place. She suggested that if Petitioner "suspected that Corrigan might 'snoop around the deal' for the purposes of 'acting on information in the market place,' [he] could have–and, indeed, should have–taken other steps to prevent such a result, such as alerting his current and future employers, as well as his client, to his suspicions." *In the Matter of Thomas W. Heath, III*, at SPA 29 n.4; *see also supra* **[pp. 12-13]**. These findings, which the SEC affirmed and we conclude are supported by substantial evidence, demonstrate why *Buchman* is entirely inapposite to this case. That is, in *Buchman*, the petitioner Shaskan was faced with the opposing interests of the SEC's concern for fraud, expressed in a specific SEC warning, and Shaskan's contractual obligation to accept the Crystalography shares. Thus Shaskan's reason for the breach of contract, i.e., a good

27

faith adherence to SEC warnings, became all important in understanding Shaskan's ethical obligation and its lack of bad faith in breaching the contract. Here, by contrast, Petitioner was faced with a different factual situation and no such competing ethical and regulatory considerations; he owed a fiduciary duty to Hibernia to keep the information confidential and he disclosed that information in violation of his ethical obligation to his client.

Moreover, the SEC has correctly understood *Buchman* to be limited to the breach of contract context. *See, e.g.*, *In the Matter of the Application of Morris E. Kurz*, 51 S.E.C. 1031, 1994 WL 91259, at *2 n.10 (Mar. 15, 1994) (breach of contract case, citing *Buchman*); *In the Matter of the Application of Robert J. Jautz*, 38 S.E.C. Docket 91, 1987 WL 757991, at *2 & n.4 (Apr. 15, 1987) (same); *In the Matter of the Application of William D. George, III*, 47 S.E.C. 368, 1980 WL 27420, at *2 & n.2 (Sept. 8, 1980) (same); *see also In the Matter of the Application of Leonard John Ialeggio*, 63 S.E.C. Docket 295, 1996 WL 632974, at *2 n.10 (Oct. 31, 1996) (citing *Buchman* as holding that a "breach of contract violate[s] [the J&E Rule] where bad faith or unethical conduct evidenced'"). This is a breach of confidence case, which implicates quintessential ethical considerations not necessarily implicated in a breach of contract case. Thus, the axiom that the J&E Rule prohibits mere unethical conduct and does not require scienter holds true in this case.[5] At bottom, the only question is whether Petitioner's breach of

---

[5] Petitioner makes much of the fact that the SEC has cited *Buchman* for two divergent propositions, i.e., that a breach of contract violates the J&E Rule if the breach was "committed in bad faith or is accompanied by unethical conduct," *see, e.g.*, *Jautz*, 1987 WL 757991, at *2 & n.4, and that such a breach violates the J&E Rule only if there is a finding of bad faith, *see George*, 1980 WL 27420, at *2 & n.2. To the extent that this precedent injects any ambiguity into the SEC's J&E Rule jurisprudence, it is limited to the breach of contract context and is therefore not relevant to this appeal.

confidence constitutes unethical conduct.[6]

Petitioner argues, however, that the bad faith standard articulated in *Buchman* has been applied outside the breach of contract context. He relies upon two SEC decisions: *In the Matter of the Application of Nicholas T. Avello*, Exchange Act Release No. 51,633, 2005 WL 1006827 (Apr. 29, 2005) ("*Avello*"), aff'd, *Avello v. SEC*, 454 F.3d 619 (7th Cir. 2006); and *In the Matter of the Application of Calvin David Fox*, 89 S.E.C. Docket 1156, 2006 WL 3455114 (Nov. 30, 2006) ("*Fox II*"), aff'd, *Fox v. SEC*, 275 F. App'x 1 (D.C. Cir. 2008), *cert. denied*, 129 S. Ct. 952 (2009).

In *Avello*, the petitioner appealed to the SEC after NASD found him liable for operating a securities business with insufficient net capital, failing to maintain accurate financial records, making inaccurate financial reports to NASD and filing six inaccurate quarterly reports. It was found that Avello was given incorrect information by a co-worker and did not act in bad faith. *Avello*, 2005 WL 1006827, at *1-3. The SEC wrote:

> Avello argues . . . that there is a requirement that NASD find there
> was bad faith before finding liability under NASD Conduct Rule
> 2110. When a violation of Conduct Rule 2110 is not based on the
> violation of some other rule, we have required a showing that the
> respondent has acted in bad faith before liability can be
> found.[FN8] There is no bad faith requirement, however, when, as
> here, a violation of Conduct Rule 2110 is based upon the violation
> of a Commission rule.

*Id.* at *3. Footnote 8 in *Avello* reads:

---

[6] Although Petitioner does not specifically argue that the record contains insufficient evidence that he engaged in unethical conduct, as explained *infra* **[p. 38]**, we hold that the evidence is overwhelming.

29

> *Robert J. Jautz*, 48 S.E.C. 702, 703-04 (1987) (if obligation to "observe high standards of commercial honor and just and equitable principles of trade" is only violation alleged, there must be a finding of bad faith).

*Id.* at *3 n.8.

First, it is clear that *Avello*'s statement regarding bad faith is *dictum* because the conduct at issue in that case violated a separate rule, which automatically amounts to a violation of the J&E Rule. Moreover, *Avello*'s citation to *Jautz* is inaccurate, as *Jautz* held that "a breach of contract violates [the J&E Rule] only if it is committed in bad faith *or is accompanied by unethical conduct*." *Jautz*, 1987 WL 757991, at *2 (emphasis added).[7]

The same two problems lie with Petitioner's citation to the SEC's decision in *Fox II*, which was issued after the remand to the NYSE in *Fox I*, *see supra* **[pp. 21-22]**. As noted, the NYSE found that Fox violated the J&E Rule by making a misstatement to his member firm employer about the status of his license to practice law in the State of Florida and by submitting to his employer an altered copy of an order of the Florida Supreme Court to support the misstatement. *Fox I*, 81 S.E.C. Docket 1511, 2003 WL 22467374, at *1 (Oct. 31, 2003). Fox argued, however, that he had a good faith mistaken belief regarding the status of his license and that he accidentally sent the altered copy of the order to his employer. *Id.* at *2. In *Fox I*, the

---

[7] In *Jautz*, NASD brought charges against Jautz, who was a broker, for soliciting and obtaining a loan from a customer and then failing to repay it. *Jautz*, 1987 WL 757991, at *1-2. With respect to Jautz's solicitation of the loan from his customer, the SEC found that he did not violate the J&E Rule because he did not act unethically, as he did not take advantage of the customer in any way or make any misrepresentation. *Id.* at *2. With respect to Jautz's failure to pay the loan, the SEC found that he intended to make repayment "but was simply unable to do so." *Id.* The SEC concluded that the latter did not constitute bad faith or unethical conduct. *Id.*

SEC, citing *Jautz*, "held that a self-regulatory organization need not find that the respondent acted with scienter, but must find that the respondent acted in bad faith or unethically." *Id.* at *3 & n.3. It noted, however, that "the NYSE did not make findings with respect to whether Fox acted in bad faith or unethically." *Id.* at *3. It remanded to the NYSE, which on remand found that Fox's conduct "was in bad faith *and* unethical." *Fox II*, 2006 WL 3455114, at *1. Fox then appealed to the SEC, but the SEC dismissed his appeal on the basis that it was untimely, and thus did not reach the merits. *See id.* at *1-2.

Petitioner hones in on a footnote in *Fox II*. The relevant text and footnote reads:

> In the remand decision, we asked the NYSE to address whether Fox's alleged conduct was in bad faith or unethical.[FN3]
>
> . . .
>
> > FN3. *Cf. Robert J. Jautz*, 48 S.E.C. 702, 703-04 (1987) (holding that if only violation alleged by NASD is failure to observe just and equitable principles of trade, there must be a finding of bad faith).

*Id.* at *1 n.3. As with *Avello*, this is *dictum* and an incorrect recitation of the law as set forth in *Jautz*.

Under these circumstances, we agree with the SEC that the incorrect *dicta* in *Avello* and *Fox II* cannot reasonably be read as signaling a rejection of the SEC's longstanding "unethical conduct" standard for J&E Rule violations outside the breach of contract context. It is clear from the Exchange Act and the relevant SEC and circuit precedent that the J&E Rule prohibits mere unethical conduct in a breach of confidence case.

While we have reached this conclusion without affording dispositive deference to the

31

NYSE or SEC, we acknowledge our obligation to afford some level of deference to their interpretation of the NYSE rules. *See Fogel v. Chestnutt*, 533 F.2d 731, 753 (2d Cir. 1975) (Friendly, *J.*) ("[A]n exchange has a substantial degree of power to interpret its own rules."), *cert. denied*, 429 U.S. 824 (1976); *accord Alderman v. SEC*, 104 F.3d 285, 288 (9th Cir. 1997); *Shultz v. SEC*, 614 F.2d 561, 571 (7th Cir. 1980) ("[B]ecause these are rules of the Exchange, the Exchange should be allowed discretion in determining their meaning. Here the Commission has affirmed that interpretation, and we find no error in its approval." (internal citations omitted)); *Intercontinental Indus., Inc. v. Am. Stock Exch.*, 452 F.2d 935, 940 (5th Cir. 1971) ("Since these are the rules of the Exchange, it should be allowed broad discretion in the determination of their meaning and application. We find no error in the Commission's approval of [this] interpretation of the rule."), *cert. denied*, 409 U.S. 842 (1972); *Moses v. Burgin*, 445 F.2d 369, 382 (1st Cir. 1971); *cf. Krull v. SEC*, 248 F.3d 907, 911-12 (9th Cir. 2001); *Gurfel v. SEC*, 205 F.3d 400, 402 (D.C. Cir. 2000).

**II.    Notice Argument**

Petitioner argues next that neither the NYSE nor the SEC has articulated a mental state standard for a J&E Rule violation. He contends that without an articulation of a mental state standard, registered members lack "fair notice of the conduct that might be sanctioned." Brief for Petitioner Thomas W. Heath III at 30. He writes, "[E]ven if [Petitioner] knew that he would be held to certain professional standards, he was still entitled to more specific guidance as to the NYSE's interpretation of the J&E Rule; there was no way of knowing in advance what kind of errors – non-negligent, innocent mistakes or isolated, serious deviations – as to the duty of

confidentiality would violate the J&E Rule." *Id.* at 38 (internal quotation marks and alterations omitted).

Petitioner's reliance on *Checkosky v. SEC*, 23 F.3d 452 (D.C. Cir. 1994) ("*Checkosky I*"), and its progeny, *Checkosky v. SEC*, 139 F.3d 221 (D.C. Cir. 1998) ("*Checkosky II*") and *Marrie v. SEC*, 374 F.3d 1196 (D.C. Cir. 2004), is misplaced. There the SEC failed to articulate the required mental state for a violation of the rule at issue (even after being instructed to do so by the D.C. Circuit). The D.C. Circuit wrote:

> Not only does the opinion on remand provide no clear mental state standard to govern Rule 2(e)(1)(ii), it seems at times almost deliberately obscurantist on the question. . . . In summary, the Commission's opinion yields no clear and coherent standard for violations of Rule 2(e)(1)(ii). Although we owe substantial deference to an agency's interpretation of its own regulations, we cannot defer to an agency when we are at a loss to know what kind of standard it is applying or how it is applying that standard to this record.

*Checkosky II*, 139 F.3d at 225 (internal quotation marks and citations omitted).

Here, by contrast, the SEC has made clear that no scienter is required and mere unethical conduct is sufficient outside the breach of contract context. Further, the SEC has made clear that industry norms and fiduciary standards are determinative as to what constitutes unethical conduct. *See, e.g.*, *In the Matter of the Application of Leonard John Ialeggio*, 63 S.E.C. Docket 295, 1996 WL 632974, at *3 (Oct. 31, 1996) (looking to "the fiduciary standards demanded of registered persons in the securities industry"); *In the Matter of the Application of E.F. Hutton & Co. Inc.*, 41 S.E.C. Docket 413, 1988 WL 901859, at *2 (July 6, 1988) ("Our aim is to give effect to the reasonable expectations of the parties to the relationship. Where there is no explicit

33

agreement to the contrary and the relationship is a fiduciary one, the law governing fiduciary duties provides presumptive definition for such expectations."); *In the Matter of Samuel B. Franklin & Co.*, 38 S.E.C. 113, 1957 WL 52433, at *3 (Nov. 18, 1957) ("The Rule states a broad ethical principle and the question presented thereunder is whether the member's conduct in question violates standards of fair dealing."). Thus, while the lack of a scienter requirement may make for a more flexible rule, we are not presented with the same obstacle as the D.C. Circuit faced in *Checkosky I* and its progeny.

Moreover, the J&E Rule's standard of unethical conduct does not fail to provide Petitioner with adequate notice that the conduct in question was sanctionable. As we explained in *Perez v. Hoblock*, 368 F.3d 166 (2d Cir. 2004):

> The Due Process Clause requires that laws be crafted with sufficient clarity to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited and to provide explicit standards for those who apply them. . . . [T]he Supreme Court has expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe.
>
> The evaluation of whether [the law at issue] is vague as applied to [appellant] must be made with respect to [his] actual conduct and not with respect to hypothetical situations at the periphery of the [regulation's] scope or with respect to the conduct of other parties who might not be forewarned by the broad language. Thus, although the prohibition [here] . . . is admittedly flexible, and officials implementing this standard will undoubtedly exercise some discretion in interpreting and applying the regulation, our primary focus must be on whether the specific conduct at issue in this case falls with sufficient clarity within the ambit of the regulation. . . .
>
> In evaluating [appellant's] vagueness claim, we must consider the context in which the regulation was enforced, i.e., we must

evaluate [his] underlying conduct by reference to the norms of the racing community.

*Id.* at 174-76 (internal quotation marks, citations and footnote omitted).

Applying these principles, we rejected the very argument that Petitioner is making here in *Crimmins v. Am. Stock Exch., Inc.*, 503 F.2d 560 (2d Cir. 1974) (*per curiam*), wherein we adopted the district court's decision, which stated:

> Plaintiff next contends that the Exchange rule barring conduct in breach of "just and equitable principles of trade" is unconstitutionally vague because the Exchange has never adopted rules specifying the prohibited acts. The contention is without merit. As an experienced registered representative, plaintiff may be fairly charged with knowledge of the ethical standards of his profession, especially where the conduct proscribed involves so central a principle as the avoidance of clear conflicts of interest. We find that, as applied to plaintiff, the Exchange's standard is not impermissibly vague, and that he lacks standing to attack the Exchange standard on the ground that it might be unconstitutional as applied to others.

*Crimmins v. Am. Stock Exch., Inc.*, 368 F. Supp. 270, 277 (S.D.N.Y. 1973); *see also Rooms v. SEC*, 444 F.3d 1208, 1214 (10th Cir. 2006) ("[A]ny reasonable person would know that this type of intentional deception of the NASD would violate [its J&E Rule] requirement that the person's conduct conform to high standards of commercial honor and just and equitable principles of trade. Mr. Rooms had been a registered representative in the securities industry since 1991. Based on those years of experience, he certainly knew that bribery and backdating and altering documents are not ethical and accepted conduct in the securities industry. Because Mr. Rooms had fair notice that his conduct was contrary to Rule 2110, we reject his due process argument." (internal citations omitted)); *Sorrell v. SEC*, 679 F.2d 1323, 1326 (9th Cir. 1982) ("Evaluating

his vagueness claim in the context of his violation, selling unregistered securities, we find Sorrell had adequate notice that such an obvious violation of the securities laws also would violate [NASD's J&E Rule].").

Thus, Petitioner's notice argument is without merit. While it may be true that Petitioner's conduct is not as egregious as that of others who have been sanctioned by the NYSE, the SEC was correct in concluding that any reasonably prudent securities professional would recognize that the disclosure of confidential client information under the circumstances of this case constitutes unethical conduct sanctionable under the J&E Rule. As the SEC explained in its Opinion:

> As an experienced investment banker, [Petitioner] can be fairly charged with notice that his breach of his duty to maintain the confidentiality of his client's information violated the just and equitable principles of trade. Any reasonably prudent securities professional would recognize that the disclosure of confidential client information violates the ethical norms of the industry. . . . [Petitioner]'s position is further undercut by the express restrictions on the use of client information in the [J.P. Morgan] Code of Conduct.

*In the Matter of the Application of Thomas W. Heath, III*, Release No. 59,223, 94 S.E.C. Docket 3466, 2009 WL 56755 (Jan. 9, 2009). Accordingly, we reject Petitioner's argument that he did not have adequate notice under the J&E Rule.

### III.   **Summary Judgment Argument**

Finally, Petitioner argues that the NYSE Chief Hearing Officer erred in granting summary judgment on the issue of guilt. First, he contends that "a determination of guilty by summary judgment denies a respondent a chance to truly test Enforcement's case" because his ability to

36

compel discovery and engage in cross-examination is limited. Brief for Petitioner Thomas W. Heath III at 44. But Petitioner fails to recognize that the record was fully developed at the penalty phase of the NYSE proceedings and the SEC thoroughly reviewed that record de novo. *See supra* **[pp. 13-14]**. In fact, Petitioner fails to point to any evidence that he was precluded from submitting during the NYSE proceedings and SEC appeal.[8]

Petitioner further argues that the Chief Hearing Officer failed to resolve questions of fact and draw reasonable inferences in his favor in violation of the summary judgment standard. In particular, he asserts that the Chief Hearing Officer failed to weigh in his favor: (i) Howard's statement that he (as a Hibernia officer and director at the time of the disclosure) did not consider Petitioner's conduct to be unethical or in breach of his trust; and (ii) Petitioner's testimony that he believed it was in his client's interest to make the disclosure in order to prevent Corrigan from "snooping around" the deal. Petitioner argues that "Howard's statement and [his own] testimony should have given rise to inferences that [Petitioner] was authorized to make the disclosure and was actively attempting to protect Hibernia's interest." Brief for Petitioner Thomas W. Heath III at 47.

This argument ignores the fact that the record was fully developed as to these facts at the penalty phase of the NYSE proceeding, and that the SEC carefully considered that record on

---

[8] At oral argument, Petitioner claimed that, if now allowed an opportunity to do so, he would submit expert testimony regarding whether his disclosure of confidential information violated ethical norms in the industry. But he never made any attempt to offer such evidence at the summary judgment or penalty phase, and indeed moved for summary judgment on the then record. We believe that the record was sufficiently developed on this issue, and that both the NYSE and the SEC adequately considered Petitioner's argument in this regard.

appeal in connection with Petitioner's assertion that he was acting in the best interests of Hibernia. With respect to Howard's testimony, the SEC found:

> [T]his former officer testified in his individual capacity, and the record suggests that he was not aware of the disclosure until after it had been made. [Petitioner]'s duty of confidentiality was owed to Hibernia as his investment banking client – not to any individual Hibernia officer or director. At the time of [Petitioner]'s conversation with Corrigan, [Petitioner] did not have general authorization to disclose information about the merger except on a need-to-know basis. In the absence of express prior authorization from his client and in accordance with the Code of Conduct, [Petitioner] remained bound by his obligation to safeguard information about the acquisition solely for Hibernia's interest.

*In the Matter of the Application of Thomas W. Heath, III*, 2009 WL 56755, at *9. With respect to Petitioner's own testimony, the SEC found:

> [Petitioner] further claims . . . that he . . . was actively attempting [] to protect Hibernia's interest by making the disclosure to freeze out Mr. Corrigan. However, [Petitioner]'s decision to divulge unquestionably confidential information was not justified on this basis. The record does not indicate that [Petitioner] could have reasonably believed that Corrigan was in a position to threaten the transaction, or that detailed disclosure was otherwise necessary to protect Hibernia's interests. The transaction had not been publicly announced and Corrigan had not indicated that he had access to any information sufficient to jeopardize the acquisition. When Corrigan referenced "rumors in the marketplace" about "a bank deal somewhere in the south," the reasonable course of action for protecting Hibernia's interest was to decline to discuss the transaction. Instead, [Petitioner] chose to divulge highly sensitive information about the critical terms of the transaction.

*Id.* (internal quotation marks omitted). These findings are drawn from a fully developed record and are supported by substantial evidence.

Finally, because the SEC conducted a thorough, de novo review of the record, any

procedural errors that may have been committed by the Chief Hearing Officer are cured. *See McCarthy v. SEC*, 406 F.3d 179, 187 (2d Cir. 2005) ("The Commission independently evaluated the extensive factual record developed by the Hearing Panel and the Board and provided a lengthy analysis of McCarthy's case, ultimately reaching a reasoned decision upholding the Board's decision. There is thus no need for us to review the lack of reasons for the Board's decision, because the due process afforded McCarthy before the Commission cured any alleged defect."); *R. H. Johnson & Co. v. SEC*, 198 F.2d 690, 695 (2d Cir. 1952) ("We conclude that we may consider any errors in the proceedings of [NASD] only if and to the extent that they infected the Commission's action by leading to errors on its part.").

## CONCLUSION

For the foregoing reasons, we DENY the Petition.